ANNA PRANGER et al., Appellants, v. NICHOLAS PRANGER,
Appellee.

GIFTS:    Evidence—Weight and Sufficiency.   Evidence reviewed,
1    and held sufficient to establish an executed gift of real estate
and possession and occupancy thereunder.

STATUTE OF FRAUDS:   Real Property—Parol Gift—Possession—
2    Improvements.  Conceding, *arguendo*, that the statute of frauds
requires one claiming lands under a parol gift to show the
making of improvements on the land, yet the ordinary cultiva-
tion and fertilization of the soil, the building of fences, the
cutting of wood, and the grubbing out of stumps and trees,
would constitute such improvements.

*Appeal from Lee District Court.*—OSCAR HALE, Judge.

OCTOBER 18, 1917.

REHEARING DENIED JANUARY 17, 1918.

ACTION in equity to quiet title. Plaintiffs are the wid-
ow and son of Ben Pranger, deceased, who was the son of
defendant.   They allege that defendant made a gift to said
deceased son, in parol, in 1904; that deceased took pos-
session thereunder, farmed the land, claiming it as his own,
until his death in 1915, for more than ten years, claiming
to own the same; and that he made improvements. After
a trial on the merits, the district court dismissed plaintiffs'
petition, and they appeal.—*Reversed.*

*E. W. McManus* and *E. C. Weber,* for appellants.

*Herminghausen & Herminghausen,* for appellee.

PRESTON, C. J.—The question presented
is largely one of fact.   After a careful read-
ing of the record, we are satisfied that the
trial court was in error in dismissing the

1. GIFTS: evi-
dence: weight
and suf-
ficiency.

petition. It may not serve any useful purpose to set out the evidence in detail, in such a case, and we shall not attempt to do so, but state the evidence in a general way, and our conclusions.

The widow, Anna, testified, over proper objection raising the question as to the statute of frauds, and other objections, to a conversation between her deceased husband and the defendant, when she was present, about February 15, 1904, substantially as follows:

"At that time, the defendant said to my husband, 'Well, Ben, I have given John his land, have sold John his land and made a reduction of $2,000; I have sold Will his land and made a reduction of $2,000. Will's land I value at $4,000, and I give it to him for two, making a reduction of $2,000. Now all is left for you, Ben, is this 30 acres that belongs to the 90 acres. That is yours. Take that. Take the possession of it. It is yours.' Thereupon and immediately after, my husband took charge of the 30 acres and entered into the possession of it. At that time, my husband owned 50 acres which adjoined the said 30 acres and lay in Washington Township, Lee County, Iowa, on the east side of the public road. The 50 acres which my husband had owned, together with the said 30 acres, on the east side of the public road, and another 10 acres lying on the west side of the public road, were originally in one farm, of 90 acres. In other words, there were 80 acres on the east side and 10 acres on the west side of the public road. From and after February, 1904, when my husband took possession of the 30 acres involved in this case, he continuously held and farmed the same, up to the time of his death. He did a great deal of grubbing upon it, scattered fertilizer, built fences, seeded it, cut wood from it, and always, in the presence of defendant and other persons, claimed he owned it, and defendant never disputed the fact. At the time defendant gave the 30 acres to my husband, he

said he would have the deed made out, and defendant kept putting it off, from time to time. Defendant always claimed and stated that the 30 acres was my husband's, and after my husband died, defendant and I were coming from the graveyard, and defendant said, 'Well, I think you can get along now. You have got 80 acres, by me giving Ben that 30 acres has helped him out.' From and after February, 1904, my husband cultivated part of the 30 acres, raised wheat, oats, and corn on it, and the year he died, seeded part of it down into hay. I took no part in the conversation in February, 1904, when defendant gave the 30 acres to my husband. Up until February, 1904, my husband did not farm, and had nothing to do with, the 30 acres in controversy. I remember it was about the middle of February, because defendant said to Ben: 'Now you take possession, it will soon be the first of March.' After that, defendant often told Ben, my husband, that the 30 acres was my husband's. I was on friendly terms with defendant; we had no difficulties. Ben grubbed out stumps in the pasture every year, generally old stumps, and cut down trees; he took out trees, roots and all. In February, 1904, defendant was not feeling well. It was a short time before he went to the hospital; he said nothing about a will. No one but myself was present when defendant told Ben he was coming down to Fort Madison to make a deed. That was quite a little while after he had given Ben the land, probably the following May. When my husband cut down the hedge fence on the 30 acres, and sold the posts, he got the money for it. I saw it paid. Deceased did not pay defendant a cent of rent after February, 1904; deceased never used the 30 acres for pasture before 1904."

Witness Hays testifies that defendant told him, about two years ago:

"I have given John the land where he lives; I give Will the land where he lives, and this land on the east side of

the road, I have given that all to Bennie."

Joseph Meyers testifies that, seven years ago, he heard a conversation between his father and defendant, and that defendant pointed to the 30 acres on the east side of the road, and said:

"I gave that piece of land there to Ben: it would make his farm better."

The father of the last witness testifies:

"I was looking over the place, and I looked across where Ben lived, and says: 'Who's that belong to?' 'Well,' says Mr. Pranger, says he, 'that belongs to Ben, I give it to Ben, or I let Ben have it.'"

George Haigh says that, nine or ten years ago, defendant said:

"'Ben has been cramped up for pasture, but I have helped him out a little now. I have given the boys, now, $2,000; I didn't give it to Ben in cash; I give him that piece of land,'—and he pointed to this 30 acres. I know that Ben has been farming it ever since that conversation, and I saw him chop wood and make fence. I saw him chop trees upon it."

Witness Fiss testifies:

"I met defendant on Ben's farm in April, 1910, and had a conversation with him, in which he said, among other things: 'Ben had 50 acres and I gave him 30 acres to make the 80,—it makes him a nice farm.'"

Also to another conversation, later in the same month, talking about the 30 acres:

"I said to Ben that I would like to have it and put in some stock, and Mr. Pranger then said to Ben: 'Yes, it would be a good thing with the 30 acres I gave you, and will make you a nice pasture land.'"

Also to a third conversation, in which defendant said he was pleased because he had given Ben the land. He said:

"That was a very good gift. I am pleased I give you the land."

Witness Gerveler testifies:

"I have land adjoining the land where Ben Pranger lived. There was a partition hedge fence between my land and the 30 acres occupied by Ben. I told defendant I desired to have the hedge fence cut. He said something about that he had kind of made a will,—I do not know what you would call it,—dividing among his children. He said it wasn't his end of the fence to keep up, that it was his son Ben's end. He said he had given each child so much."

Alice Sangord says:

"I had a conversation with defendant about three years ago. He told me that he gave his son this 30 acres on his share of his estate; he said it made Ben 80 acres altogether. My husband and I worked for Ben on that place about nine years; during that time I saw him plowing, cultivating, fertilizing, and doing other work on the 30 acres; my husband did grubbing on the 30 acres for Ben, and he paid him for it; Ben told me he owned the 30 acres."

The defendant was 76 years of age at the time of the trial. He denies, or attempts to, much of the testimony of the different witnesses as to conversations claimed by them to have been had with him, and in a way denies the contract as testified to by plaintiff,—perhaps we should say that he attempts to deny substantially all of it; and yet his evidence is not as positive as one would expect, under the circumstances, if he really meant to claim that he had not given this land to his son Ben. At some places in his testimony, he substantially admits a part, at least, of plaintiff's claim. He and some of the other witnesses seem to have thought that, because the deed had not been executed, therefore there was no completed gift of the land; and some of them in their testimony really mean that, we think. Cases of this kind are usually tried after the death of the

alleged donor. But there is no question in this case as to evidence of personal transactions, under Section 4604 of the Code.

Having stated that defendant, perhaps, intended to deny all the testimony, we shall notice some parts of it, to show the manner in which he attempts to deny, but will not attempt to give all the testimony of this witness or the others. He testifies to having sold and deeded 50 acres of land to his son Ben, and admits that the 50 acres were Ben's individual property. As to the alleged conversation between defendant and Ben, as testified to by Mrs. Anna Pranger, he at first put it in this way:

"I do not remember of having a conversation during the middle of ·February, 1904, with Ben and his wife, or with Ben in the presence of his wife, concerning the land."

We said, in *Eckert v. Century Fire Ins. Co.*, 147 Iowa 507, 510, that such testimony,—that is, that a witness had no recollection of a conversation,—did not raise a conflict in the evidence. It will be noticed, further on, that the defendant, as a witness, testifies in much the same way as to the other conversations testified to by plaintiff's witnesses. It should be said, however, that, after defendant testified as before quoted, he did say, with more positiveness:

"I did not have a conversation with him at that time to the effect that I would give him the 30 acres, and that he should take possession of it."

He testified that, during a part of the time at least, his stock passed from the east to the west side under a bridge, and that the two tracts were used together. He says that, six or seven years ago, he left a piece of timber there for the use of Ben; that he would have cut it off, but he let it stay so that Ben could build a barn; that he had helped build barns for the other boys; that he advised all of his boys as to carrying on their farms, and counseled with them, and gave them suggestions and fatherly advice, and that he spoke

to Ben at one time about cutting hedge, and, over objection by plaintiff, testifies that he told Ben, if he didn't farm right, he couldn't have the land any more; that he told Ben that all he expected of him for the use of the land was enough money to pay the taxes, and the defendant did pay the taxes; that he gave the land in to the assessor; says he does not remember having a conversation with the two Meyers, as testified to by them. He denies that he told plaintiff, when they went to the cemetery together, that she would have 80 acres, but admits that he told her, at that time, that she would be able to get along. He says: "I told her she should never have a cent." He says he remembers a conversation with Mr. Haigh, and that they were talking about most people's not having land enough; and that Haigh asked him how many acres Ben had, and witness told him "50;" that Haigh then said, "That is quite a small farm;" and witness said, "It is rather small, but I let Ben have that piece across the road,—that will make him 80 acres." As to this, he testifies further:

"I don't know that I said that piece across the road, or whether I said 30 acres, but I know that I said that would make him 80 acres. Q. Did you tell Mr. Haigh that you had given Ben the land at that time? A. No, I said I let him have it. Says I, 'I let Ben have that.' Well, I don't care how you have it happen, so it is all the same. I don't care whether it was a gift or let."

He claims that he occasionally repaired some of the fence on the west side of the 30 acres, and that, when a post rotted off, he slipped in one or so, but didn't make a practice of doing it, because Ben was to keep up the fences. He testifies that he refused to allow Ben to sell the 30 acres, at a time when the son talked of selling his 50 acres. In reference to a deed which was made by Mr. Schlemer to the 30 acres in favor of Ben, defendant says:

"In 1904, Mr. Schlemer made a deed to the 30 acres

in favor of Ben, but I wouldn't sign it; also he made the deed at my suggestion. It was after Ben was using the 30 acres. I told Ben that he could have the use of the 30 acres about a month before I told Mr. Schlemer to prepare a deed. I told Ben at different times I wouldn't make him a deed. I only talked with Ben once about making a deed. Ben never asked me to make a deed to that land only that one time, and he didn't claim it was his. I never said I would go to town and make a deed,—I don't think I ever said that. I never put a crop on that 30 acres since 1904. Ben never paid me any money for the use of it; I didn't ask him for it; I calculated to let Ben use the land until he died. In my will, I provided for Ben for that piece of land, and assigned him in the will probably $500 in money. The will I drew made mention of the 30 acres and $500. After Ben died, I notified the plaintiff not to trespass on the land."

When recalled, he testified further:

"At the time Schlemer drew the deed for me, I was in the hospital, very sick, and he suggested that the deed should be made in connection with the will."

He doesn't know what became of the deed; says he met the witness Fiss a few times, but does not recall any conversation with him; he doesn't remember when he destroyed the will,—it was a long time ago; he doesn't remember telling Ben about the deed. He says further:

"My intention was, as I did not expect to live, to let Ben have that piece of land adjoining him, and $500; and John and Will, I had deeded them some land and made a reduction. I valued the land at $1,000, and I sold John and Will their farms, and made a reduction of $2,000 to each. I paid $500 on a note for Ben, with the $1,500 value placed on the land would make his $2,000. I do not remember telling this to Ben. After Ben's death, his widow asked me about the land. I told her it was intended under the will

for Ben, but I destroyed my will, and I didn't calculate to live up to it. I didn't say I was going to give Anna Pranger the note and take the land back instead."

John Pranger, Louis Pranger, and Will Pranger, sons of defendant, testify to some of the transactions referred to in the evidence of their father, as to carrying on the land, and as to conversations with deceased, claimed by defendant to be inconsistent with plaintiff's claim.

One Hitch testifies for defendant, to having seen Ben working the land in controversy, and says that, at one time, he talked with him about it, and asked him if he wanted to raise another crop, and Ben said the old man wouldn't let him: he wanted to seed it. Witness says, however, that, to his knowledge, Ben had possession of that 30 acres for years.

Buecker testifies to a conversation two years ago with Ben, in regard to the 30 acres. He says the conversation was a kind of a tangled-up affair in his mind, but the conversation was passed in some way that Ben hadn't received as much as his brothers; that, as near as he remembers, Ben said he didn't get enough from home; that some of his brothers got $2,000 in cash, or land, but his father hadn't given him anything. On cross-examination, he says:

"I don't know just what he meant by his talk; I do not remember exactly what the conversation was."

Mrs. Buecker testifies that something was said in relation to property, and that they received something; and that is as much as she could say.

Witness Ritter testifies that he had a conversation with Ben three years before, when cutting wood, and that he asked Ben why he didn't cut out the back brush, and he said it wasn't his; that he helped defendant set two posts by the gate on the road on the east side; and on cross-examination, he says that, in a different conversation, de-

fendant told him that Ben didn't have a deed to all his land.

Roxlau says he hauled sand from the east side of the road, and obtained permission from defendant; he thinks he got permission from defendant, but would not say that he did not ask Ben's permission.

In rebuttal, witness Kench testifies:

"At one time I had a conversation with Nicholas Pranger concerning the land in question. At the time, I had lived on the farm for three years, and he had rented it to me for another year, and I had started to plow a little, and he came and said that the boys wanted their farms, and he would not let me have the place. I was then living on the farm that Ben Pranger lived on. He said that he had given the boys their places, had given John his farm, Will the farm where he lived, and had given Ben that one east of the road."

Cross-examination:

"I had the farm that Will Pranger lives on now. I was not farming the farm where Ben lived. He was farming that himself. That was twelve years ago,—the fall of 1905."

Anna Pranger says, on rebuttal, that her husband never used any of the 30 acres for any purpose until February, 1904, when defendant gave him the land, and that, until 1904, her husband did not keep his horses on the 30 acres; that the flood gate, in February, 1904, was always kept closed; that, after her husband died, defendant came over, and said:

"Well, Anna, I have a little account against Ben. You know that last $500 I paid for Ben, I will turn that $500 over to you and will take the land back, or you will have to pay me that $500."

She testified further that defendant said to Ben, in reference to the taxes:

"I will pay the taxes for you until you take my name off of that $500, and when I die, I will turn the tax receipts over to you, and you will have to pay me the money, what I paid on that land for you, because John and Will had paid their own taxes."

He told Ben that, in the fall of 1913. She stated that defendant always said, "Ben, I will pay the taxes for you until you are able to take my name off that note." Witness testifies further:

"I was present when the assessor came and took the assessment of my husband. My husband, in answer to the assessor as to how many acres he had, said, 'Fifty and the thirty, but I haven't the deed for it yet.'"

Plaintiff Roy Pranger testifies substantially in the same way as his mother, in regard to what defendant said to his mother about paying the $500 note.

Staley says that, soon after Ben died, he had a conversation with defendant, in which defendant said that Ben had the land, but that he had gotten a little more than his share, and that he had gone Ben's security on a $500 note, and he was going to turn that note over to Anna, and take back the land instead.

We have not attempted to harmonize the different conflicting statements as to minor matters, but this is the substance of the testimony in the case, and we think it is sufficient to show a completed gift of the land and possession and occupancy thereunder, and that it was not a mere arrangement or intention on the part of deceased to make a gift in the future, as contended by defendant, though he doubtless intended to rest the legal title in his son at some later time. He had given his other sons substantially the same amount of land, and it is quite clear to us that, under the record, he gave this land to his son Ben, and intended and expected to vest the title in him, and we have no doubt that, had the son lived, he would have done so.

It is thought by defendant that there was no change of possession by deceased which was referable to the alleged gift, but we think otherwise under the record; and it is said, too, that the son Ben said it was not his. This may be true, in the sense that he did not have the legal title. It is true that the land was assessed to the defendant and the taxes paid by him, but this is satisfactorily explained in the testimony.

2. STATUTE OF FRAUDS: real property: parol gift: possession: improvements.

Appellant relies upon *Bevington v. Bevington*, 133 Iowa 351; *Albright v. Albright*, 153 Iowa 397; and other cases. It is argued by appellee that the improvements shown are not sufficient, as valuable and permanent improvements. It is true that no buildings are shown to have been constructed, but we think the improvements were such as to satisfy the rule under the authority of the *Albright* case, if it be conceded that the statute of frauds requires that the making of permanent improvements be shown. Of course, it would be a strong circumstance if a party is able to show that permanent improvements were made in reliance upon a parol contract.

It is our conclusion that the decree should have been for plaintiffs. The cause is, therefore, reversed, with directions to the trial court to enter a decree for plaintiffs, or they may have such a decree in this court, at their election.—*Reversed.*

WEAVER, GAYNOR, and STEVENS, JJ., concur.