JOHN LEMBKE, Appellee, v. EMMA LEMBKE et al., Appellants.

FRAUDS, STATUTE OF: Parol Gift of Land. A parol gift of land, clearly and unequivocally established, is valid and enforcible when accompanied by a clear and unequivocal showing of part performance by the donee, in the form of acts referable exclusively to the gift.

*Appeal from Cass District Court.*—J. B. ROCKAFELLOW, Judge.

MAY 2, 1922.

REHEARING DENIED NOVEMBER 21, 1922.

ACTION to quiet title and obtain possession of certain real estate in Cass County, Iowa. The opinion states the facts. Decree was entered finding the equities of the cause to be with the plaintiff. Defendants appeal.—*Reversed.*

*Ira C. Paschal, W. C. Bryant,* and *Frank Wisdom,* for appellants.

*Swan, Clovis & Swan,* for appellee.

DE GRAFF, J.—The plaintiff John Lembke claims to be the owner of a certain 80 acres of Cass County, Iowa land by reason of holding the record title thereto. Plaintiff alleges that in 1918 he orally leased to his son Henry Lembke the land in controversy and that upon the death of the son, the widow and defendant Emma Lembke refused to surrender possession of the land. The other defendants are the surviving children and heirs at law of the deceased son.

It is the contention of appellants that they are the owners of said land by reason of a parol gift from the plaintiff to plaintiff's son Henry during the latter's lifetime, and by cross-petition defendants pray that they be declared "the absolute owners by title in fee simple" to said land.

This court has many times announced that a person seeking to compel a conveyance of land which he claims as his own by reason of a parol gift must establish the gift by clear, unequivocal, and definite testimony, and that the acts claimed to be done by the claimant thereunder, and relied upon as part performance, should be equally clear and definite and referable exclusively to the claimed gift. The burden of proof is upon him asking performance. *Truman v. Truman,* 79 Iowa 506.

It is not sufficient that the evidence shows a mere balance of doubts or probabilities. Neither is it required that the proof offered in support of the gift should be undisputed, but it must be of such a character that reasonable certainty of the truth of

the ultimate fact in controversy is established. *Bevington v. Bevington,* 133 Iowa 351; *Albright v. Albright,* 153 Iowa 397, 406.

Equity has relaxed the rigidity of the statute of frauds, and protects a parol gift of land, if accompanied by possession, and the donee induced by the promise of gift, has made valuable improvements on the property, and especially is this true if the expenditures have been made by virtue of an agreement or stipulation by and between the parties to the gift that the expenditures should be made in consideration of or as a condition for the gift.

This case like all cases of this character presents to this court fact questions only, and in presenting the facts a summary of the recitals made by appellant will suffice.

In 1893 the plaintiff, then 56 years of age, was a resident of Griswold. His family at that time consisted of himself, wife, three sons and one daughter. He possessed a home and certain lots in the town of Griswold. Near by he bought a tract of 320 acres consisting of four eighties lying side by side which theretofore had been used as a ranch.

His oldest son Henry was in California where he had acquired a property. John alone was married. Philip and Dora were at home. The family moved down to the one house on the ranch. John and wife moved in with them. Henry returned from California. Emma, sister of the wife of John, came from her home in Illinois to help care for the children of Anna. The former returned to visit her mother and one day Henry said to the family that he and Emma were going to get married and move to California. Henry was an honest boy and had never given his father any trouble. His parents opposed his going, and the father to persuade him to remain, promised to give him the 80 acres in controversy and build a house upon it if he would abandon his purpose to go to California, sell his California property, get married, take possession, and improve the 80 and make it a home. Henry accepted that proposition, and consummated the agreement. Upon Emma's return she was made acquainted with it and approved it. They were married and at once moved into a little building on the farm called the shop until better arrangements could be made.

Father Lembke had already told John that he would build a house upon the east 80 for him and Anna and give it to him if they would move upon it and improve it and make it their home.   John accepted the proposition.   An annual rental or annuity was reserved in both cases.

Soon after Henry's marriage Father Lembke and wife moved back to their home in Griswold and room was thus made for Henry in the ranch house where he lived until about 1900, when the building was completed on his 80, at least as to the four lower rooms.   And as soon as it was completed Henry and family moved in and there they remained continuously.

Pearl, the eldest, was married from there; Jennie and Glenn were born there; from that home, Henry was carried to his last resting place; from that home, Glenn entered the army of the United States against the encroachments of the kaiser, ruler of his grandfather's natal country.

Evidently Henry was of a placid disposition who yielded naturally to the dominance of his father and true to German instinct and tradition submitted to his direction.   After the house was built and he and his brother John were having difficulty about housing the animals and the grain, Henry went to his father for directions.   In substance, he was directed by his father to build such granaries and barns and erect such improvements as he desired.   But said less quick thinking son, "How do I know that after I do all this you will not sell the place?"   Then and there he was assured that nothing of the kind would occur, that he would get his deed.   To forever lay the doubt at rest he followed his statement with this: "Anna, here, is a witness for you."   If Henry ever had a doubt of his father's purpose after that, it does not appear either in his conduct or his actions.   When members of his family complained or sought to discuss the matter he blindly advised them to keep their mouths shut.   The sequel shows that this was no more than common prudence.

Henry and his family worked upon the 80 acres as if their very salvation depended upon it.   They planted an immense orchard, and all kinds of small fruits and berries.   The mother and daughters hoed and weeded them.   The mother worked in the field like a man.   The girls dressed in overalls did

the work of boys. When they became tired and worn they were inspired ·to further efforts by some suggestion from Father Lembke that they make more improvements. And so inspired, they built a yard fence around the house, planting cement posts, and beautified that yard with roses, vines, shrubbery and ornamental trees. They dug a well and was prepared to force water by a force pump into the house when Henry died. A telephone line was extended by Henry to the house. He built a vast hay barn and a large double granary. He fenced and cross-fenced. Henry bought a tractor for the purpose, as alleged by Father Lembke, to lay a ditch between his 80 and the west 80 because the land was wet. They planted flowers, set out shrubs and plants, and made the place beautiful and attractive at a cost of $200 or $300. In building the house a basement was put under it and Emma Lembke used money that she had before her marriage to put in a foundation and place bricks between the studding to make the building warmer. The downstairs was plastered and paid for by Henry, and the girls, who are artists, decorated the walls by hand painting the same.

If Father Lembke, did in fact bear the larger expense in building the house he did no more than he had agreed to do. However, when John's wife Anna complained that their house had but four rooms and small windows while Henry's was being provided with large windows and a second story, Father Lembke explained that Henry was paying for the extra windows—and no doubt he did.

Mother Lembke was in good health. She did not come forward and contradict the testimony of Anna that Father Lembke had agreed to give Henry the farm if he would remain in Iowa, live on it and improve it. Philip though on the stand did not lift his voice in the slightest contradiction. Dora, who was on the stand, did not whisper a refutation. Nobody but Father Lembke contradicts and his memory was so uncertain that he could remember very little accurately and distinctly.

It is possible that Henry Bierbaum tells the truth when he says that he heard Henry say to his sister Dora, that he would not put any more improvements upon the 80 because he did not know for sure that he was ever going to get a deed. Henry might have possessed that feeling, but that does not

establish that no such agreement was made. It corroborates the contention of the appellants that such agreement had been made and should have been executed long before. Henry Bierbaum, husband of Dora, is the only witness that ever heard Henry express any doubt as to his father's keeping the agreement he had made.

Many of Father Lembke's statements are clearly untrue without his realizing that fact. His good neighbors, holding neither malice against him nor desire to aid the appellants, under solemnity of an oath, detailed statements which he had made freely and unqualifiedly declaring Henry's ownership.

The evidence discloses that one E. E. McCarthy, an insurance agent, took an application from Henry for fire insurance in May 1917. The application covered all of the buildings on the premises in controversy. McCarthy testified: "Before I took the application from Henry Lembke I went to John Lembke, (the father) and solicited insurance on the farm buildings. He said that he had deeded the land to Henry and that if Henry wanted any insurance he would have to write it. He said he had not delivered the deed as he had remuneration coming to him during his lifetime, payment to be made by Henry as long as he (plaintiff) lived." The application for insurance contained certain questions and answers. These answers were written by the agent as given to the agent by Father Lembke. One question reads: "Is the title to the land on which said buildings are situated in your name?" Answer: "Father's. Deed made to H. M. Lembke." Another question reads: "Is the building occupied for private dwelling only?" Answer: "Yes." Question: "By owner or tenant?" Answer: "Owner." A policy of insurance was issued upon this application, loss payable to Henry and his father, and delivered to Henry and the premium was paid by Henry. This occurrence happened and the policy was issued a few weeks before the death of Henry.

Another witness Milo Cook, a plasterer, had occasion to talk to Father Lembke about doing the plastering work on the dwelling house that was constructed on Henry's 80. Cook testified: "I asked Mr. Lembke, the plaintiff, about getting to do the plastering work and he said it was Henry's deal and told me

to see Henry. I saw Henry and he let me plaster the house and paid me for it."

F. G. Van Meter is a real estate agent living in Griswold. During the summer of Henry's death the agent told Father Lembke that he had an opportunity to sell the 80 in question and asked him to list it. Van Meter did not know who owned the 80. This witness testified: "He (Father Lembke) said no, he wouldn't sell it; it belonged to Mrs. Emma Lembke."

Shortly before Henry died one Grant Mackrill a reputable farmer who had lived near Griswold 49 years and who was acquainted with the plaintiff for more than 20 years testified to a conversation with the plaintiff concerning the 80 acres in controversy. Mackrill testifies that Father Lembke said to him: "I have given away this farm but the boys need my advice occasionally. When I go to the farm I do too much work. While I have given each of the children eighty acres of land I do not need to do any work. I do it of my own accord to promote their interests." On that occasion Father Lembke had been working on a tank and was overtaken on the road by Mackrill while plaintiff was walking back to town.

Another witness Frank Shallborg a long-time resident and farmer near Griswold had a conversation with Father Lembke while on the farm prior to the death of Henry. At that time plaintiff was working on some water tanks. In the conversation Shallborg said to plaintiff "You are fixing up Henry's tanks? and he answered, 'no, this isn't Henry's,' and he pointed to the east and said 'over there is Henry's.'"

Another real estate agent, J. L. Balcom, residing in Griswold was acquainted with the farm owned by Father Lembke and prior to Henry's death had a talk with Father Lembke about the 80 in controversy and asked him if the 80 acres where Henry lived was for sale. "I want to list it. Plaintiff said 'no, that he had given that 80 to the boy.' Q. Did he say Henry? A. Yes, he mentioned Henry's name to me."

One of Henry's children named Lola, past 20 years of age testified that on one occasion when Father Lembke was at Henry's place that her mother was making some objection to putting any more improvements on the place until the 80 was deeded. Father Lembke apparently overheard the remark and

Lola testifies: "He came in and said for them to put them on, meaning improvements; that the place was theirs and that they would get their deed all right."

Mrs. Bollinger, a married daughter of Henry, testified that on one occasion she overheard a conversation between Father Lembke and her parents at the dinner table. Father Lembke had been helping Philip on the day in question while Henry and the children had been hauling sand for foundation for a building. One of Henry's horses had just died. "My mother said to papa we had better stop hauling. The horse is dead and we have been working ourselves to death and we have no deed yet. Grandfather said 'go ahead and build, the place is yours and I want you to improve it.' I have heard many conversations about the 80 although I cannot remember the exact words. They were all to the purpose that the 80 was my father's. All the family knew it and so understood it and so did Father Lembke and my father."

Another daughter Jennie 13 years of age was with her mother and her grandfather Lembke at the undertaker's place in Griswold soon after the father's death. Upon that occasion this girl testified: "My grandfather and mother had a conversation. Grandfather said he gave the 80 acres to Henry and it now belongs to you and the children."

The widow Emma Lembke recites in detail the facts and circumstances connected with the history of this transaction. She corroborates the statements of the other witnesses relative to the declarations which Father Lembke had made at different times, and the improvements made upon the land. Henry died in 1917. Emma remained on the 80 for some time thereafter. She testified: "After my husband's death in June, myself and the children farmed the place. Glenn helped before he went to the war and Lola and Jennie. Pearl helped until she was married. I hired some help. I found the farm difficult and in the fall of 1917 I had a chance to rent the south 40 to Mr. Reading a near neighbor. * * * I went to settle with Father Lembke about the 2d of March. Lola and Jennie went with me to his house in Griswold. I spoke to him about the sum and he said '$300 and it couldn't be changed as long as either of us lived,' he meant Mother Lembke and himself. I wrote the check and

he said 'Emma ain't you going to pay the taxes.' I said that I understood that he was to pay the taxes. He said 'the taxes are much higher than then.' '' All these declarations concerning Henry's ownership Father Lembke flatly denies. He also denies the parol gift, but we must recognize his mental and physical condition at the time of the trial. He had suffered three paralytic strokes and was 79 years of age. His answers indicate his mental condition. But it is not what he said in his lifetime that carries the stronger conviction but his statements and conduct after Henry's death.

Along the line on the north is a fence south of the road. The west 80 and Henry's 80 were divided by a line fence. In the summer· and after Henry's death Father Lembke sent down to the farm a heavy cement fence post. He had the widow pay the man for bringing it down. He went to the northeast corner of the west 80 which would be the northwest corner of Henry's 80 and dug a hole for the post and then he repaired to Henry's home and after dinner he asked for help in setting the post. The widow and Lola helped him erect and place it. At the time he made no comments upon why he did it, but there can be but one explanation. He knew that he had given the 80 to Henry and now it belonged to the widow and children. And there, at this northwest corner of the 80, he erected a lasting monument to the memory of the covenant with his dead son and a lasting muniment of the title held by the surviving widow and children. This marked only one corner. To make sure that the whole division line was clearly indicated he advised the widow and Lola to plant a line of catalpa trees all the way down to the other corner of the 80. When he was performing this labor, when he was giving this advice, the memory of Henry was with him, for he said to his helpers, ''Henry bought the tractor to dig a ditch on this line.''

We have not attempted to set out all the facts and circumstances presented by a voluminous record. It is shown without dispute that Henry purchased and paid for considerable quantities of lumber and materials from lumber companies in Griswold. The account with the Joyce Lumber Company between 1900 and 1914 shows that lumber and building material to the value of $752 was purchased by Henry and that he paid the

account in full. This lumber and material was placed in improvements on the 80 in dispute. It is also shown that Henry bought and paid for in cash other lumber and materials.

It may also be noted that shortly after Father Lembke deeded the 80 to John the 80 was sold. This sale apparently displeased Father Lembke and this fact may have had some influence upon him, and may explain in some degree his failure to deed the 80 in controversy to his son Henry. John never returned to visit his father and at the time of the trial was ill and unable to attend although the evidence shows he was willing so to do had he been able to travel. Henry expressed his regret that John had sold his 80 and that it would induce his father to withhold his deed from him under the belief that he (Henry) might do the same thing.

Anna testified that Father Lembke went to an attorney to have a deed prepared covering the land in controversy to Henry. ''He gave as a reason that he was in poor health and wanted to make it safe. This was in the fall of 1912.''

Appellee contends that the defendants fail to distinguish the tenure of the 80 acres in controversy from that of the 40 acres farmed in connection with it by Henry, which 40 acres defendants do not claim. Henry did not farm this 40. It was used for pasture. No grain was raised thereon and consequently could not have been included in the original agreement which provided for a rental on a crop basis of two fifths. This arrangement was mutually changed later to the payment of a rental or annuity of $300. The dominion which Henry exercised was over the 80. He never claimed the 40. The subject of conversation and of declarations on the part of everyone relates to the 80. Henry believed he owned the 80 and he died believing he owned it.

It will serve no purpose to attempt to harmonize conflicting statements in the record as to minor matters. We are satisfied that the arrangement made between Father Lembke and his son Henry was not a mere intention on the part of the owner to make a gift of this land to Henry in the future. It was a gift *in præsenti.*

Equity and good conscience require under the circumstances that the donor do the thing which he said he would do

as an inspiration for nearly 15 years of possession of the land, material expenditures by way of improvements, and of hard work on the part of Henry and the members of his family. There is no occasion to harmonize or attempt to harmonize conflicting cases and decisions involving similar subject-matter of this dispute. Each case is bottomed upon its own facts and further discussion of the law or of the facts would not be beneficial to the parties, profitable to the profession, or useful to the literature of the law.

It is sufficient to say for the purpose of this case that on the whole evidence it is reasonably certain that a parol gift was made and the intention of the donor is clear and unequivocal. See *Pranger v. Pranger,* 182 Iowa 639; *Hagerty v. Hagerty,* 186 Iowa 1329; *Albright v. Albright,* 153 Iowa 397.

The widow Emma Lembke did not voluntarily surrender the possession of the premises in controversy. Henry's death may have been the cause for the change of attitude toward Emma and her children or there may have been other reasons, but it matters not. Furthermore it is immaterial whether Father Lembke intended to evidence the parol gift which he made by deed or by will. He failed in the former and repudiated the latter by making a will since Henry's death that dismembers the 80.

The facts are against the claim of the appellee and justice and equity require that the claims of the defendants should be sustained. Wherefore the judgment and decree entered is reversed, plaintiff's petition is ordered dismissed at his costs, and the trial court is directed to enter a decree establishing the interests of the defendants as the same may appear in conformity to this opinion, reserving a lien on the real estate in favor of appellant in the amount of the annuity as provided by the agreement.—*Reversed and remanded.*

STEVENS, C. J., WEAVER and PRESTON, JJ., concur.