J. Q. WILLIAMS, appellant, v. HARKER CHAPMAN et ux., appellees.

No. 47790.

(Reported in 46 N.W.2d 56)

FEBRUARY 6, 1951.

Crary, DeWitt & Crary, of Sioux City, for appellant.

Prichard & Prichard, of Onawa, for appellees.

BLISS, J.—The facts are the determining factor in this case. The land involved is a 131-acre farm near the town of Hornick in Woodbury County. Plaintiff has the record title to the land through sheriff's deed obtained May 6, 1940, in the foreclosure of a mortgage which he had on the place. Plaintiff, who was ninety-five years old in September 1950, operated a retail hardware store in Hornick from 1903 to October 1942, at which time he was forced to close the business because he had become totally blind about March 1942. He had lost the sight in one eye some years before. His wife died in 1913. He had no children. His oldest brother, Tom, though his family lived in Wisconsin for several years prior to his death in 1924, worked for plaintiff in his business for about eight months of each year.

Defendant Harriet Chapman is a daughter of Tom Williams, and a niece of plaintiff. She is his nearest relative. The defendant Harker Chapman is the husband of Harriet. They have several sons and daughters. Before defendants moved to Iowa in January 1941 they had operated a large dairy farm near Darlington, Wisconsin. During the years when her father assisted plaintiff in his store Harriet Chapman was a visitor in plaintiff's home in Hornick, after his wife's death, one or more times each year. On occasions she would stay several weeks, assisting in the home and store when plaintiff was not feeling well. Defendants' daughter Lillian also visited plaintiff.

In his petition, filed March 10, 1950, plaintiff alleged that defendants were occupying the farm gratuitously as his tenants at will, having gone into possession in 1941 under an oral agreement with him that defendants were to pay no rent during their occupancy and were to retain possession only so long as he should permit. Attached to petition were copies of a notice terminating

the tenancy on March 1, 1950, under Code chapter 562, served on defendants August 18, 1949, and of a three-day notice to quit the premises served on them March 2, 1950.

By answer defendants denied the allegation as to tenancy at will, and by cross-petition alleged that about April 1940 plaintiff stated to defendants that if they would move to Iowa and live on the farm and help look after him, they could live there as long as the plaintiff lived without paying any rent but the taxes on the property, and that he would will the property to Harriet Chapman so that it would be her property on his death. They alleged that they accepted the offer and took possession of the farm March 1, 1941, and have occupied it since; that plaintiff, when totally blind, came to their home on the farm in March 1942, and lived there under their care until August 18, 1949, when he voluntarily left without any cause therefor on their part, and after he had contracted to sell the farm to another. They allege complete performance of the contract on their part, in so far as plaintiff permitted them. They prayed for full protection of their rights.

In his reply plaintiff alleged that "defendants were to have the use of the premises without the payment of rent except an amount sufficient to pay taxes thereon during such period of time as the plaintiff desired to live in their home."

Plaintiff had owned a half-section farm in Monona County for a good many years. On August 7, 1933, he wrote a letter to "Dear Hattie." He began the letter thus: "I have been thinking of you several times lately and am now going to ask you and Harker to come out this fall as I want to show you the farm now and if your boys are still farming am going to make you a good bargain. I built a new house on the place a year ago last spring, tore the old one down so now have a respectable place for anyone to move in. The place is a Jonah to me the last two years, though I have a good farmer on it but he lacks ability in the business end. I would like you and Harker to come out if the boys are still with you and want to farm and will make it worth while. I can't let my man go this coming year because he owes me too much but it would give you a year to think over my proposition." He finished his letter thus: "Make arrangements this fall to get here for awhile; as I will be looking forward

till you come. If my proposition doesn't appeal to you there won't be any damage done." Defendants were not interested in breaking off home ties in Wisconsin.

Defendants' daughter Lillian, forty years old, wife of Earl Sandley, being too ill to travel testified by deposition that: she had visited plaintiff in July or August 1937 for about ten days, after a trip with friends to Pocahontas, Iowa, and he had sent a car to fetch her from Correctionville to Hornick; that one day during this visit while in plaintiff's store he took a paper from his safe, which was his will, signed by him and witnessed, saying, "Here is something I want you to see", and he showed her that part of the will that stated that her mother was to have the Monona County farm, and after she read it he folded the paper and put it back. She also testified that in January or February 1939 plaintiff wrote her to visit him and sent her carfare; that he was sick in bed with the flu in March 1939 when she arrived, and after his recovery she stayed on until January 1940, when she returned to her home and was married shortly after; that before she left, plaintiff asked her if she thought her folks would come to live with him out there and run the Davis farm, and said that if they would do that he would "change things" and mother would get that farm instead of the Monona County farm. She testified that before she left for home in January 1940 her mother came to plaintiff's home. Other visits were made afterwards by Lillian to plaintiff's home.

Mrs. Chapman had been with plaintiff when his first eye went bad, and came again before her daughter returned home in January 1940, and later her husband came out to return home with her. They were both there in April 1940 when plaintiff discussed with them his proposition. He discussed the matter first with Mr. Chapman, and he deferred answering until his wife had passed upon it. She was asked:

"Can you tell the court what that conversation was at that time? A. Well, my husband was in the store, they had talked it over about us coming out on the farm. My husband said we would talk it over when I got over to the store and he asked me then if we would come out here. Of course I looked in a general way to my husband because he had lived on that farm [the Wisconsin farm] for so long and I didn't suppose anything could

take him off of it and I said if he wanted to come I would come. Mr. Williams asked us if we would come out on the Davis farm. We talked it over a little later about what kind of arrangements or what kind of rent. Of course I expected he would eventually not be able to see and he would come up there and live with us. We were to have that farm or it was to come to me when he was done with it, and we were to pay the taxes after he came up there.

"The Court: What do you mean by the expression, 'when he was done with it'? A. Well, I suppose a man at his age expected some day he might pass on and that is what he meant I suppose. Of course most men don't live as long as he has and we naturally didn't think so either, but we kept him talked into living longer and he was in excellent health when he left our place. Q. Then were there later conversations about this and definite arrangements then later made in connection with your moving out? A. Yes I guess the final arrangements were made after we came out here January the 21st, 1941. Of course we came out to be with him. Q. Now state to the court what conversations were had about the final arrangements that were made at that time? A. He just said that the place was to come to me when he was through with it and of course we were to pay the taxes on it *as long as he was there.*"

Mr. Chapman's testimony was substantially the same as that of his wife.

With reference to the italicized words Mr. Chapman testified that plaintiff said "he wanted four per cent on $9000 [the amount he had in the place], four per cent interest and the taxes." Plaintiff did not live with them on the farm in 1941, and they paid plaintiff the $360 interest for a year and the taxes on the farm for that year. When plaintiff returned from the hospital totally blind in March 1942 he asked to be and was taken to the Chapmans on the farm. They gave him the bedroom downstairs and the "sitting room." They furnished the rooms particularly for his comfort and convenience. The furniture was always left in the same place. They built a long sidewalk from his bedroom door, and another long sidewalk in the opposite direction, and they stretched wires along each walk, so that when the weather was suitable plaintiff could take his walks in safety. He always

had the same place at the table. He had a rather sensitive stomach, and Mrs. Chapman, who prided herself somewhat on being a dietician, prepared special food and meals for him.

After his blindness in March 1942 he still had his business undisposed of and Mrs. Chapman took him to the store every day and remained there with him and waited on the trade, took in the receipts and kept the books, from eight o'clock in the morning until six o'clock at night. This was repeated every weekday until the business was closed out in the latter part of October 1942. A Mr. Patrick, an expert in closing-out sales, was hired for the last two weeks.

Mrs. Chapman did his laundry and pressed his clothes. He "dressed up" each day, and always wore a white shirt. Twice a week Mr. or Mrs. Chapman took plaintiff to Hornick to the bank and the barber shop and also took him every place he cared to go. The Chapmans had no hired help and Mrs. Chapman was kept very close at home waiting on and watching over plaintiff. When she had to be away she had a neighbor lady across the street look in occasionally to see if plaintiff was all right. Plaintiff paid no board and he made no contribution toward any expense about the place or for his personal needs. He so testified.

The farm was badly run down. The buildings, except the house, were dilapidated, and the fences were gone. The previous tenant was merely a cropper. The place needed a corncrib and a hog house. Plaintiff put these on in 1941. Defendants, at their own expense, built a new double garage, enclosed the back porch, built fences, built a large dike along the public open ditch to keep out overflow water, insulated part of the house, and put a cement driveway between the corncribs. These permanent improvements cost defendants over $900, not counting Mr. Chapman's labor.

No interest payments were made by defendants after 1941. They paid only the taxes. They did not do this directly, as plaintiff always had the bank at Hornick pay the taxes on both of his farms, but the defendants reimbursed him. Finally plaintiff refused to accept reimbursement for the taxes he had paid and would not accept a check for $1000 which Mrs. Chapman offered him for that purpose.

There was testimony other than the Chapmans as to the excellent care which they gave to plaintiff. There is no evidence

300

of any complaints by plaintiff about his treatment from defendants. He testified to no improper treatment or that they were the cause of his leaving. He and his banker, E. S. Fitzgerald, testified that he had listed both farms for sale in 1948. Sometime in the late summer of 1949, Fitzgerald found a purchaser at $135 an acre and plaintiff signed the contract of sale. He told Chapman after he got in the car after leaving the bank that he had sold the Davis farm for that price. Chapman admitted that he said to plaintiff at that time that he would have paid more than that. Chapman thought the farm was worth $200 an acre, and there was evidence that eighty acres of the bottom land was worth $225 an acre. Chapman testified that what he meant was that rather than lose the place he would have paid more than plaintiff sold it for. On that very day—August 18, 1949—that plaintiff had the notice terminating the lease served, he called a conveyance and left the Chapman home and never returned.

The Chapmans promptly counseled with their attorneys of record, and a meeting was had by one of them and plaintiff and Fitzgerald. The latter was a witness for plaintiff. On his cross-examination this record was made:

"Q. Now, Mr. Fitzgerald, do you recall a conversation in your bank in Hornick where myself and Mr. Williams and yourself were present in the summer of 1949 and prior to the time that Mr. Williams moved from the farm? A. I do. Q. And do you recall in that conversation that I stated that the Chapmans were quite put out over the fact that Mr. Williams had decided to sell his farm after they had understood that they were to have the farm when he died? A. Yes. Q. And do you recall that in answer thereto Mr. Williams stated that he had a right to change his mind, or words to that effect? A. Yes, he made something to that effect."

Plaintiff closed his case without denying that this conversation took place and without any comment on it.

There are a number of items of testimony strongly corroborating the testimony of the defendants and their daughter, particularly in the light of plaintiff's testimony. On "Dec. 16-40" plaintiff wrote another "Dear Hattie" letter—he began it on the 16th and finished it on the 18th. It was another newsy letter

about the neighbors and the weather and how the deep snow interfered with corn picking. It stated:

"The Davis place may be picked though I don't know as I haven't seen Beem for some time, he had a fine field of corn, he said some of it was making 100 bushels which is a lot of corn. * * * Will be looking for you after the first of the year or as soon as you feel like coming. We can't do much of anything till March 1st so suit yourselves when you come out. * * * Well I am wishing you all a Merry Xmas & Happy New Year and I guess I will see you when you get here. Your uncle, J. Q. Williams."

The envelope was addressed to Mrs. Harker Chapman, Darlington, Wisconsin, and postmarked. Both defendants testified to the receipt of the letter and that the signature and writing were that of the plaintiff.

On cross-examination of plaintiff in the main case, this is the record:

"Q. Is it not true, Mr. Williams, that at the time that the Chapmans came out to Iowa from Wisconsin and moved on this Davis farm that they did so with an agreement and understanding of some kind with you with reference to their rights in that land at that time? A. No, they didn't come out under any agreement. Q. Do you mean to say then, Mr. Williams, by your answer that there was no understanding or agreement of any kind between you and the Chapmans as to what rent if anything they were to pay on that land or what rights as to possession they might have? A. That is what I mean to say. They came out to me, when they went on that farm they come out and says, well, Chapman says, 'Might as well go out now as any other time,' he says, 'we are broke.' Just put them up on the farm there and left them there, and with about as much interest or rent or anything. I boarded there for some time with them, boarded and lodged there. Q. Mr. Williams, isn't it true that sometime prior to the year that the Chapmans came out and moved on the Woodbury County farm that you had tried to make a deal with them to come out and live on the Monona County farm? A. Never, never at any time, never considered it. He wasn't capable of

handling it, I knew that. Q. What I am trying to get at is, Mr. Williams, that you are now certain that there was no effort made on your part to ever have them come out and live on the Monona County farm? A. Never had the faintest notion. I thought these people were on top of the world because I had seen the farm they were on back there and at that time they had 60 or 65 head of cows and a fellow generally fixed like that isn't very hard up, I thought they were on top of the world there, had all he could take care of, lived at home with his boys. Never had the faintest idea of him coming out or any of them until they finally did come out and said they were broke. The place I speak of is in Wisconsin." And immediately he rambled on: "The mother .owned it when I knew them, I knew her father. I was a married man, my wife died in '13, I have no children, we lost three, premature, they all died in infancy. My wife is buried in Grace-land. I have been living alone ever since."

In his direct examination on defendants' cross-petition, plaintiff testified:

"I heard part of Mr. and Mrs. Chapman's testimony. I heard them make some statement about my giving them that farm up there. Q. Did you ever have such conversation with them? A. *Not that I know of.* Q. At any time or any place did you ever tell them they were to have this farm when you were through with it for taking care of you? A. No, I wasn't hiring people to take care of me. I was able to do that myself. I wasn't broke. Q. Have you ever made any arrangements or agreements with the Chapmans, whereby they were to become owners of the Davis farm in question? A. No. Some time ago, see, I had two farms."

Testifying on cross-examination with reference to the letter of August 7, 1933, purported to have been written by him to Mrs. Chapman, this is the record, omitting some immaterial matters:

"Q. Don't you recall that in 1933 you wrote to the Chapmans and tried to interest them in coming to Iowa and living on the Monona County farm? A. No, that is too far back for me. Q. You don't have any remembrance of anything of that kind? A. No, sir, I don't know anything about it. Q. But the

letter which has been offered and introduced in this case as one of the exhibits was actually written by you, was it not, Mr. Williams? A. I couldn't tell you. Q. You have had the letter read to you, have you not? A. Yes, I don't know whether or not I wrote that letter." (Being asked about the defendants' visiting at and prior to April 1940 he replied that he thought they came out permanently and moved on the farm in March 1941.) "Q. Previous to that, before March 1941 hadn't Mr. Chapman and Mrs. Chapman been in Iowa and made arrangements about coming out in 1941? A. *I don't think so.* Q. Now did you wait until they came out in 1941 before any arrangements were made that they were to come out? A. Do you want me to tell you? Q. Yes. A. They came out there and hadn't been in the house I don't think 15 minutes, well, they said, 'We are broke.' What do you make out of that? Q. Mr. Williams, I have here in my hand a letter which Mrs. Chapman has identified as a letter that you wrote to her on December 16, 1940, in which you state 'will be looking for you after the first of the year or as soon as you feel like coming. We can't do much of anything until March 1st so suit yourselves when you come out.' Do you recall writing to Mrs. Chapman any such letter in December 1940? A. 1940? No, I don't remember anything about writing the letter. Q. But if you did write such letter to them in December 1940 you must have had some previous arrangements with them about their coming out before you wrote that letter, is that not correct? A. No, I don't know why. Q. Did you have any arrangements with them before that letter was written? A. I had no arrangements with them to come out here until they came out. Q. But you had known and you had told them to come? A. No, I didn't. Q. And you told them to come any time they wanted to after the first of the year? A. *I don't know.* When they came out there, why, just like I have told you once before, came out and said, 'we are broke.' I had made no arrangements with anyone to lease that property before they came out for the year 1941. I don't make lease arrangements. They came out there and I let them go on the farm. I wanted to sell it to them. I offered them the place for $9000, just what it cost me and I didn't ask them for any money either" (and yet just a few minutes later, in his cross-examination, the plaintiff testified): *"I never at any time*

*asked the Chapmans whether they wanted to buy it. In fact I never asked anybody to buy it.* Some previous years before I told various people that had inquired in regard to whether or not it was for sale that it was not for sale. Q. Now isn't it also, Mr. Williams, possible that you may have told them why it was not for sale at that time? A. I don't see why I should. Q. Well, but isn't it likely that you might have in the course of the conversation? A. Not necessarily. That's all there was to that. I think if I had given them any reason you probably would have had them here telling about it."

Mr. Cecil J. Burris, fifty years old, a representative for a Chicago publishing company at the time of the trial, had been superintendent of Hornick schools from 1926 to 1945. He was well-acquainted with the plaintiff, as he often bought manual training supplies at his store. As a witness for defendants he was asked:

"Did you have a conversation with plaintiff about the farm after he became the owner? A. It relates to the interval of time during which Mr. Williams had an investment in the farm but not full title to it, and so I will say, in conclusion, deals with the interval when I heard that Mr. and Mrs. Chapman were coming out to take over the operation of the farm. When I heard that I asked Mr. Williams if it were true and he said yes, his eyesight was failing, and that he had to have someone to look after him, and he said that he had made arrangements with them to come out and take over the operation of the farm and he was going to make his home with them. I said, 'Well, would the farm be for sale now, Mr. Williams?', and he said, 'No, I have made arrangements for them to come out and I am going to live with them until I die. * * * I am going to live out there until I die.' He said, 'The place is really theirs now.'"

The witness testified that he was interested in buying the place and that was why he asked Mr. Williams the questions. His father had recently bought an unimproved tract adjoining the Davis farm, and of much the same quality, for which he paid $225 an acre.

Mr. Lyle Trautt, forty-one years old, had lived on a farm about one and one-half miles from the Davis farm since 1942.

He knew all of the parties. As a witness for defendants he testified he stopped to see Mr. Chapman in the fall of 1945 and they were not at home, and he visited with Mr. Williams for about an hour: "So I asked him if he intended to sell the farm, that I was interested, and he said no, that the farm was not for sale. He told me that Mrs. Chapman was supposed to have the farm for keeping him as long as he lived, taking care of him. There was no one else there at the time we were having this conversation. I did not wait for the Chapmans to come home." The witness repeated the testimony on cross-examination, recross-examination, and redirect examination. In the last examination—the redirect—he was asked to tell just what Williams said, as near as he could remember, and answered: "That is the reason he told me that it was not for sale at all. I asked him if he thought he would ever sell it and he said no. He says, 'I figure on staying here as long as I live' and as long as they took care of him and she was to have the farm. Q. That she was to have the farm? A. Yes, sir."

Mr. A. A. Green, seventy-four, had known plaintiff for many years, and talked with him just prior to 1943 about Mrs. Chapman, who was working about the store, and plaintiff told him two or three times that she was the only relative and whatever he had would go to her, without mentioning any particular property.

Plaintiff denied none of the testimony of these witnesses.

Plaintiff was asked this question:

"Now, Mr. Williams, I wish you would tell the court whether or not after the time that the Chapmans came out on this farm or after you acquired this farm if you did not make a will in which you willed this farm to your niece Hattie Chapman? A. Yes, there was a will made but it was conditional. I had a will made and there was four of those boys was to get a couple thousand dollars apiece when she got it. I made a will on two witnesses. I wasn't looking after the old folks."

In appellees' argument it is stated that "those boys" were Harriet Chapman's boys. It is not denied in appellant's reply argument.

There is no evidence that defendants were broke when they

came to Hornick in January 1941. Each denied that either of them told plaintiff they were broke at the time they came to Iowa, or at any other time. Defendants were each sixty-nine years old. Mr. Chapman had been living on the same farm—a 280-acre place—for over sixty years. It had been owned by the Chapman family for many years. He did not own it, but he operated it. One of his boys was assisting him just before they came to Iowa, and he then took over the entire management. Mr. Chapman testified that he did not have to leave the farm, but he would have remained there had not plaintiff's proposition been made and accepted, and that was what induced them to come to Iowa. After he came to Iowa the Wisconsin farm was sold at sheriff's sale in 1942, at which time Mr. Chapman went back to Wisconsin and bought it—280 acres at $45 an acre. It was a cash transaction, which he financed through an insurance company. He has repaid this money and he now owns this improved dairy farm.

Plaintiff denied that he ever showed Lillian his will. He gave as his reasons that he never kept any will in his safe at the store, but always left them at the bank. He said that testimony of hers was a "blank lie", but he did not deny that he had made a will giving the Monona County farm to Mrs. Chapman. And he did not deny her testimony that he had asked her if she thought her parents would come out and run the Davis farm and live with him, and that if they would the will would be changed, and she would get the Davis farm instead of the Monona County farm.

The trial court reviewed the evidence in its findings and decree, and adjudged and decreed that: plaintiff's petition be dismissed; plaintiff be permanently enjoined from selling or encumbering or otherwise disposing of the farm; the defendants are entitled to the possession of the farm during plaintiff's lifetime, and Harriet is decreed to be the owner of a vested interest in the land to become absolute on death of plaintiff, senior and superior to the rights of any other person claiming under him, all providing the following conditions are complied with, to wit: that defendants pay all unpaid taxes assessed on the property during plaintiff's lifetime, before their delinquency; that defendants furnish plaintiff a home as they did before his departure,

if he elects to return to said farm; and that, should he not so elect, the defendants pay into the clerk of the Woodbury County District Court, $100 forthwith and $100 on June 1, 1950, and on the first day of the month thereafter as long as plaintiff lives and does not make his home with the defendants.

Plaintiff relies upon two propositions for reversal: (1) that the admission of the claimed oral statements of plaintiff establishing an interest of defendants in the real estate violated the Statute of Frauds; (2) that the amount and quality of the evidence in support of any agreement between the parties was insufficient to sustain defendants' burden of proof. The defendants have argued to the contrary.

The able and experienced judge to whom the case was submitted found that defendants had established the allegations of their cross-petition with evidence of the quantity and quality required by the decisions of this court, and by section 622.33, Codes of 1946, 1950, and I. C. A., in which section the exceptions to section 622.32 of said Codes are stated. He had the witnesses before him and observed their appearance, and manner of testifying, and was thereby aided in reaching his conclusions as to the credibility of the testimony and the veracity of the witnesses. The case has been reviewed anew on this appeal and our conclusion from reading the testimony is that the evidence fully sustains the allegations of defendants' cross-petition, and brings their case within section 622.33, supra.

I. It is a well-recognized rule of this court that an oral agreement for a conveyance of land, or the transfer of an interest therein must be established by clear, convincing and satisfactory evidence and that courts should scrutinize and weigh the evidence with great care. Extensive citation of authority for the rule is unnecessary. Bevington v. Bevington, 133 Iowa 351, 358, 110 N.W. 840, 9 L. R. A., N. S., 508, 12 Ann. Cas. 490; Hurst v. Jenkins, 161 Iowa 414, 421, 143 N.W. 401; Ford v. Young, 225 Iowa 956, 962, 282 N.W. 324; Williams v. Harrison, 228 Iowa 715, 723, 293 N.W. 41; Daily v. Minnick, 117 Iowa 563, 91 N.W. 913, 60 L. R. A. 840; Fairall v. Arnold, 226 Iowa 977, 285 N.W. 664.

But, as stated in Bevington v. Bevington, supra, 133 Iowa 351, 358:

"This does not mean, of course, that the proof in support of the gift must be undisputed. * * * The law requires nothing more than that the result shall not be reached by a mere balancing of doubts or probabilities, but by clear and unequivocal proof of facts upon which a court or jury may reach a reasonably satisfactory conclusion. In other words the rule does not require absolute certainty, but reasonable certainty of the truth of the ultimate fact in controversy." (Quoted with approval in Albright v. Albright, 153 Iowa 397, 406, 133 N.W. 737.)

After approving the rule above-stated, the court in Lembke v. Lembke, 194 Iowa 808, 809, 810, 187 N.W. 863, stated:

"Equity has relaxed the rigidity of the statute of frauds, and protects a parol gift of land, if accompanied by possession, and the donee induced by the promise of gift, has made valuable improvements on the property, and especially is this true if the expenditures have been made by virtue of an agreement or stipulation by and between the parties to the gift that the expenditures should be made in consideration of or as a condition for the gift."

Our most recent statement of the rule was by our late beloved Justice Hale, in Lynch v. Lynch, 239 Iowa 1245, 1253, 34 N.W.2d 485, 489:

"Nor is it necessary that there be any actual change of possession where the donee is in possession at the time of gift, the change in the character of possession being sufficient. * * * Such gifts may be established provided the facts and circumstances fairly tend to show the alleged gift. Lembke v. Lembke, supra. The degree of proof need not be to an absolute certainty, but only a reasonable certainty is necessary. Albright v. Albright, 153 Iowa 397, 133 N.W. 737; Sires v. Melvin, 135 Iowa 460, 113 N.W. 106."

A case in which the circumstances and situation were quite similar to those in the instant case is Hurst v. Jenkins, 161 Iowa 414, 416, 143 N.W. 401, 403, in which the court said:

"It is well-settled that a parol agreement to perform such services [caring for an elderly couple] is a sufficient consideration

to support an agreement for the transfer of title to real estate; and if the agreement is established by the quantity and quality of evidence required in such cases, and there has been a performance of the contract, the agreement is binding and enforceable. Under such circumstances, the contract is taken out of the statute of frauds, or rather it comes within the exceptions to that statute." (Citing numerous decisions of this court.)

There is nothing unreasonable or improbable about the claim made by defendants. Their testimony appears to have been frank and straightforward, and strongly corroborated, while that of the plaintiff has little corroboration and carries no conviction of its truth on material matters. So far as the record shows the Chapmans were the only ones of his relatives who had close contacts with plaintiff or were interested in his welfare. Lillian came to him when he was ill. He sent for her. She kept house for him and helped him in the store for almost a year. He admits that except board and lodging he paid her nothing. Mrs. Chapman was frequently with him. She was there when he lost the sight of his first eye. Their relations were close and friendly. Despite his denials of writing the letters urging them to move to his locality, the proof to the contrary is overwhelming. His testimony that wholly unannounced they came to him broke and begging is not worthy of belief. In 1940 he was eighty-five years old, blind in one eye and blindness in the other eye impending, a fact which he realized. It is not strange that he wished to have those near who had been friendly with him and of close kinship. The defendants were well-situated with their children about them in Wisconsin. They were old and at an age when they were probably looking forward to retirement. Before they would leave those surroundings and go into possession of a neglected farm and assume the care of an aged blind man, it is reasonable to believe that an attractive offer was made to them. They came out and went into possession of the farm. They made substantial and permanent improvements as they were needed. Mrs. Chapman worked daily in the store for over six months in closing out the stock. Plaintiff came into their home and received the very best of care—care that was confining and burdensome. They did this for seven and a half years.

Lillian testified that he asked her in 1937 if she thought her parents would care to live on the Davis farm, and that he showed her his will in which he gave the Monona County farm to her mother. He told her, she testified, that if they would go onto the Davis farm he would change the will and give her that farm. Mrs. Chapman testified that in the April 1940 talk he told them that if they would move to Iowa and occupy the Davis farm and take care of him, "it was to come to me when he was done." Those were plaintiff's words, and in answer to a question of the court as to what she meant by the expression, she said she supposed "he expected to pass on someday and that is what he meant." Very strong proof of the truth of her testimony is the admission of plaintiff that after defendants moved to the farm he did make a will devising the Davis farm to Mrs. Chapman, conditioned, as he said, with payments to "those boys."

Defendants came to Hornick in January 1941 and lived with plaintiff until their furnishings arrived. On their arrival the arrangements were discussed again. At that time and before they took actual possession of the farm, Mrs. Chapman testified: "He just said that the place was to come to me when he was through with it and of course we were to pay the taxes on it as long as he was there." The clear import of the statement of plaintiff is that the Chapmans were to occupy the farm and that he was to live with them and that the place was to be hers on his death.

The testimony of the witnesses who were interested in buying the farm, respecting the admissions of plaintiff to them, is convincing corroboration of defendants' testimony of their agreement with plaintiff. Their moving to Iowa onto this farm, their making of substantial permanent improvements on it, their care of plaintiff and work done for him in the store, are matters all definitely referable to their claimed agreement and not reconcilable with any other reasonable hypothesis.

The equities of the case are strongly with the defendants. For over seven years they provided for all of the needs, comforts and pleasures of the plaintiff, such as he could enjoy. They performed fully on their part. As we said in Garman v. Wettengel, 199 Iowa 1150, 1155, 203 N.W. 266, 268: "The equities behind the plaintiff's claim are strong enough to warrant their acceptance as corroboration of the direct testimony in the record, in

support of such claim." Similar language was used in Kisor v. Litzenberg, 203 Iowa 1183, 1187, 212 N.W. 343.

The weakness of the plaintiff's testimony and its unconvincing character adds weight to the testimony of the defendants. When he was asked if he had the conversation with defendants in which the alleged agreement was made, his answer was *"Not that I know of"*; when asked if defendants had been in Iowa prior to March 1941 and had made arrangements about coming out in 1941, his answer was *"I don't think so"*; and when asked if in the letter of December 16, 1940, he had told them to come any time after the first of the year, his answer was "I don't know." Of such answers we have said that they do not raise a conflict on the point or matter inquired about. Eckert v. Century Fire Ins. Co., 147 Iowa 507, 510, 124 N.W. 170; Pranger v. Pranger, 182 Iowa 639, 644, 164 N.W. 607; Rance v. Gaddis, 226 Iowa 531, 545, 546, 284 N.W. 468; Page v. Parks, 232 Iowa 879, 884, 6 N.W.2d 298.

Speaking of the term "purchase money", as used in Code section 622.33, supra, we said in Daily v. Minnick, supra, 117 Iowa 563, 569, 570, 91 N.W. 913, 915, 60 L. R. A. 840, 843:

"That has been settled by numerous previous decisions of this court. Thus, in Devin v. Himer, 29 Iowa 297, it is held that such term means the consideration received, in whatever form it may exist. See also Mitchell v. Colby, 95 Iowa 202. In many cases the performance of services has been held to be the payment of the purchase price. Bonnon v. Urton, 3 G. Greene 228; Stem v. Nysonger, 69 Iowa 512; Franklin v. Tuckerman, 68 Iowa 572, and cases cited."

Under the record it is our conclusion that the evidence introduced by defendants did not violate the Iowa Statute of Frauds; that the direct testimony of the defendants as corroborated by other testimony, the admission of plaintiff that he executed a will devising that farm to Harriet Chapman, and the conceded facts that defendants moved from Wisconsin to the Davis farm, went into possession of it, made permanent improvements on it, and made a home for plaintiff on that farm and provided fully for his comfort and needs until he voluntarily left that home definitely bring the case within the exceptions

of Code section 622.33 of the Iowa Codes of 1946 and 1950. It is our further conclusion that said testimony of defendants as evidence of the alleged agreement was of that clear, convincing and satisfying character required by the decisions of this court, and that all things done by defendants were just as clearly established as being referable to said agreement.

The judgment and decree of the district court is therefore affirmed in all its parts and in every respect.—Affirmed.

All JUSTICES concur except JUSTICE MANTZ, not sitting.