T. F. COLLINS ET AL., v. JAMES H. COLLINS, Cross Petitioner and Appellant.

**Specific performance:** STATUTE OF FRAUDS: EVIDENCE. To obviate the statute of frauds the oral proof of an agreement to convey land must be clear, unequivocal and definite, and the acts claimed to constitute part performance must be exclusively referable to the agreement. Evidence examined and held insufficient to establish an agreement by a deceased to convey certain lands in consideration of services rendered or to be rendered him in his lifetime.

*Appeal from Davis District Court.*— HON. ROBERT SLOAN, Judge.

MONDAY, FEBRUARY 17, 1908.

REHEARING DENIED, TUESDAY, MAY 12, 1908.

CALEB Collins died intestate and without issue August 11, 1905, seized of five farms, three in Iowa and two in Missouri. His wife had departed this life in 1898. His heirs, the parties to this action, are two brothers, T. F. and John W. Collins, John H. Collins, the only child of a de-

ceased brother, Andrew Collins, the six children of another
deceased brother, Robert Collins, and the heirs of a deceased
sister, Sarah Ann Hollingsworth.   The action was in parti-
tion, but the only issue tried was raised by the cross-petition
of James H. Collins, one of the sons of Robert, in which
he alleged:   That the same was sold to this defendant by
the deceased during his lifetime for services rendered said
deceased by this defendant, and this defendant has paid the
purchase price of said Savanah farm, and said Caleb Collins
was to convey the same to this defendant, but has neglected
to do so.   And in an amendment that:   " The said Caleb
Collins, deceased, was to give to James Collins, the de-
fendant herein and plaintiff in cross-petition, the Savanah
farm for what services he, James Collins, had done for him,
and, when Caleb Collins got sick and sent for the said James
Collins, he was to come and help take care of him; but the
said Caleb Collins was to have the use of said Savanah farm
as long as he, Caleb Collins, lived, and, when he died, it
was to become the property of James Collins."   The answer
of the other heirs " denies that the said Caleb Collins ever was
or became indebted to the said James Collins for any of said
alleged services or labor, and denies that the said James Col-
lins is entitled to the relief asked, or is entitled to have the
title to said lands quieted in him, and they deny that any
contract or sale was ever made of said land by Caleb Collins
to James Collins, and deny that Caleb Collins ever promised
or agreed to convey or sell the land to the said James Col-
lins for work performed for him by said James Collins, or
for any other consideration or in any other way or manner,
.   .   .   deny that Caleb Collins ever sold the said Savanah
farm to the said James Collins for the consideration set forth
by James Collins in his cross-petition and the amendments
thereto, or for any other consideration, and deny that the said
Caleb Collins ever sold or gave or contracted to give to the
said James Collins the said lands set forth in paragraph 4
of said Collins' cross-petition, and known as the ' Savanah

Farm.' "   The answer also pleaded that the contract, if made, was within the statute of frauds.   Upon hearing the cross-petition was dismissed.   James H. Collins appealed.   He has died since, and his widow and heirs have been substituted as parties plaintiff in his stead.—*Affirmed.*

*T. P. Bence,* for appellant.

*Payne & Sowers,* for appellees.

LADD, C. J.— The issue tried was whether the deceased entered into a contract with James H. Collins about April, 1905, by the terms of which the former agreed to make out a deed to a tract of land known as the " Savanah Farm," and place the same in escrow, to be delivered upon his death to James as grantee therein named in consideration of services the latter had rendered him in the past, and then agreed to render in the future.   The suggestion that the alleged agreement was not well pleaded is disposed of by the excerpts from the cross-petition and answer in the statement of facts preceding this opinion, as is also the claim that the land referred to as the Savanah farm was not identified.   It was specifically described in paragraph 4 of the cross-petition, and the answer referred to " the said lands set out in paragraph 4 of said Collins' cross-petition and known as the ' Savanah Farm.' "   Besides this, when identifying evidence was tendered, the court, without objection of either party, announced it to be " conceded that the land claimed by plaintiff is properly described by him in his cross-petition, and is called the ' Savanah Farm.' "

No deed was made, and the cross-petitioner relied on parol evidence, not only to establish the contract, but part performance as well.   To obviate the statute of frauds, such proof must be clear, unequivocal and definite, and the acts claimed to constitute part or entire performance on the part of James referable exclusively to the agreement.   *William-*

*son v. Williamson,* 4 Iowa, 282. Testimony of what deceased said he was going to do in the future is of little aid, save as indicating an unexecuted purpose. Of this character was his declaration to Cooksie that " he was going to give him [James] this Savanah farm for what he had done for him," and that to Maggie Herold, his sister-in-law, when she suggested that James build across the road, that " he did not want him to build there, because he was going to give him the Savanah farm." The testimony of his declarations that he had not done so is of no greater importance. This was by Dooley, who assisted in caring for him during his last sickness and heard James ask: " Uncle, have you made that and left it with Carruthers ? " to which deceased replied: " No; I have not, Jimmie. I will attend to that as soon as I am able, but I am not able now. I am so nervous I cannot write my own name." And, immediately before he bade those about farewell, James' mother heard him say: " Jimmie, I did not do for you what I expected to do, or what I intended." It will be noted that in none of these statements was there any allusion to an agreement or promise on his part. But there was some evidence of a more definite character. The wife of James testified that deceased, after inquiring of James if he had kept account, said to him: " ' I have made up my mind to give you the Savanah farm for what you have done for me, if you will accept it; ' and my husband said, ' That will be satisfactory with me, uncle.' Uncle Caleb said that he wanted the use of that place, meaning the Savanah farm, but wanted the use of that place as long as he lived, and he said, ' If I get sick and send for you, I want you to come and take care of me '; and Jimmie said, ' All right, uncle, I will do it.' Caleb said, ' I will make a deed for you and leave it with Sam Carruthers '; and Jimmie said, ' That will be satisfactory with me, uncle.' " Maggie Herold testified to the same conversation, and Carruthers related an interview with deceased several months prior to his death, in which the latter asked whether he could

make and acknowledge deeds and retain them in his own possession to take effect at his death. Being told that such deeds would be of no account unless delivered to the grantee or deposited in escrow to be delivered upon his death, deceased replied that he would come in later and have his will drawn. This was all the evidence bearing on the issues, save that proving that James had rendered services for the deceased at frequent intervals on his farm and by doing errands for him, such as paying his taxes and attending to business matters, and that he had assisted in caring for him during the last ten or twelve days of his life. The deceased had lived for many years on a farm about a mile west of Stiles. The home of James H. Collins was on his brother's farm about two miles southeast of Bloomfield, where he had lived about a year. Prior to that he had resided for sixteen months at Valley Junction, to which place he had moved from Bloomfield, where he had been engaged in business for three years previous. Prior to that he had resided on his mother's farm near Stiles since 1886. It is apparent that for five years or more James had not been easily accessible to deceased, and, before that, most of the things he had done for his uncle were of a kind for which he might without impropriety have exacted compensation even from a near relative. Probably they were mutually friendly, but the record is peculiarly wanting in evidence of those personal services, save a few errands, usually proven in such cases. Certain it is that the alleged consideration, aside from love and affection, was grossly inadequate. Even if the promise were made " in payment of all James had done," the latter did not change his situation as to the past transactions in any way. Nothing was done under the agreement referable exclusively thereto, save, as is contended, the assistance in the care of deceased during his last sickness. According to both witnesses, his request that the nephew come and care for him when sick was added after his statement that he would convey the farm for what had been done. It is hardly con-

ceivable that either supposed that James was being employed to care for his uncle at a price.   Indeed, every expression of deceased, save in the hearing of these two women, indicated that his thought was to give to James, not to execute an obligation in his favor, and, as he did not do so, equity cannot relieve.   The record has failed to convince us that, if deceased promised to convey the land, this promise was rescued from the operation of the statute of frauds by part performance.—*Affirmed.*