IN RE ESTATE OF SARAH RUNNELLS.

EDITH KEAIRNES McINTOSH, Appellee, v. F. W. CURTIS, Executor, et al., Appellants.

CONTRACTS: Parties, Proposals, and Acceptance—Contract With Deceased—Failure of Proof. A claimant against an estate who is

sui juris does not competently establish a mutually binding contract between claimant and the deceased for the conveyance of land by deceased to claimant by proving a conversation (1) which took place in the presence of claimant, but solely between the mother of claimant and the deceased, (2) which was in no manner addressed to claimant, and (3) in which claimant took no part.

**FRAUDS, STATUTE OF:**  Operation of Statute—Part Performance— 2  Essentials of Consideration.  An oral contract for the conveyance of land is not taken out of the statute of frauds (1) by establishing a *past and executed* consideration for the contract, or (2) by establishing the *subsequent* performance of an essentially nominal consideration.

Headnote 1:  24 C. J. p. 865.  Headnote 2:  27 C. J. pp. 325 (Anno.), 349.

*Appeal from Harrison District Court.*—H. J. MANTZ, Judge.

FEBRUARY 18, 1927.

Plaintiff is a claimant against the estate of the decedent, Sarah Runnells.  She predicates her claim upon the breach of an oral express contract for the conveyance or devise of a farm. Her claim is for $15,000, the alleged value of such farm.  There was a trial to a jury, and a verdict for $15,000, upon which judgment was entered.  The defendant appeals.—*Reversed.*

*Lloyd Harding, H. L. Robertson,* and *Robertson & Havens,* for appellants.

*C. W. Kellogg,* for appellee.

EVANS, C. J.—I.  The more important difficulties of this case involve its collisions with Section 11257, Code of 1924 (Section 4604, Code of 1897), and with the statute of frauds, Section 11286, Code of 1924.

The claimant predicated her case in the first instance upon two grounds: (1) *Quantum meruit;* (2) oral express contract. She later withdrew the *quantum meruit* count, and rested her case upon the alleged express contract and her performance thereof.  All the testimony of the claimant was received over appropriate objections, which need not be incorporated herein.

The multiplicity of these objections has made a confusing record, and the like multiplicity of 85 assignments of error has swelled the appellant's brief to undue proportions, and has greatly counteracted the aid which we might otherwise receive therefrom.

The evidence relied on by the claimant in proof of the contract was a certain conversation had between the deceased and the claimant's mother, who was sister to the deceased. The plaintiff herself testified to this conversation, and testified that she took no part therein. The mother, Julia Keairnes, purported to testify also to the same conversation, and testified likewise that the claimant took no part therein. Corroborative evidence by other witnesses, in the nature of admissions of the deceased, was also introduced. This means that the evidence of the contract was circumstantial only, and not direct, and that reliance was had upon the inferences which could properly be drawn from such circumstances. *McElhenney v. Hendricks*, 82 Iowa 657; *In re Estate of La Grange*, 191 Iowa 129; *Campbell v. Collins*, 133 Iowa 152; *Campbell v. Collins*, 152 Iowa 608.

1. CONTRACTS: parties, proposals, and acceptance: contract with deceased: failure of proof.

One of the manifest errors upon the record is that the district court submitted the case to the jury by instructions which contained no reference to the circumstantial or indirect character of the evidence. We are more particularly concerned, however, with the question whether the evidence was sufficient to warrant a submission to the jury at all. The claimant's withdrawal of the *quantum meruit* count of her petition was well advised. In that regard, the claim is not a meritorious one. If her claim can be sustained, it must be on the ground of an express contract, for a consideration performed by the claimant.

Mrs. Runnells, the decedent, was a widow since 1904. Her only child, a married daughter, died in 1913, without issue. Up to the time of her husband's death, she lived upon a farm of 120 acres. Thereafter, she moved to the town of Dunlap, having acquired a home there. In this home she lived during the last 20 years of her life. She died in April, 1924. She was the owner of the farm and her home in Dunlap and other property, amounting to a total of about $32,000. She lived comfortably,

and appears to have expended her income freely and generously. Her brothers and sisters lived near by, and she had many nephews and nieces. One of these was the claimant, upon whom the decedent bestowed many favors until about the year 1920. From that date forward, the relations between the claimant and her aunt were not cordial. At the time of the event under consideration, the claimant was an unmarried woman, 38 years of age. She was, and had been for many years, in the employment of the telephone company, as an operator, and received wages ranging from $35 to $55 a month. In 1912, the decedent took a trip to California, and at her own expense took the claimant with her. In 1915, another trip of the same kind was taken to California. In 1918, a similar trip was taken to Denver. Each of these trips occupied from three to four weeks. On one of them another cousin, Bertha Keairnes, was taken along. These were clearly pleasure trips, taken for the mutual enjoyment of all parties, and paid for by the decedent. Near the beginning of 1919, a similar trip to Florida was taken by the decedent and by the claimant, at the expense of the decedent. The claim put forth herein is that the Florida trip became the occasion of the contract upon breach of which the claimant's cause is predicated. Her pleading was that the decedent promised to give claimant the farm, in consideration of services *performed and to be performed* during a period of 13 years from 1908 to 1921, and that the trips to California and Denver and Florida were all made in reliance upon such promise. Her evidence, however, as to the making of the alleged contract was directed to a time just preceding the Florida trip, and the only evidence of subsequent performance on her part was the taking of the Florida trip.

An intelligent discussion of the sufficiency of the evidence to sustain the verdict will be impossible unless we set forth a considerable portion thereof. To this end we devote the following division of this opinion.

II. For the purpose of setting forth evidence herein, objections and rulings will be omitted. As to the making of the contract with the decedent, the claimant testified as follows:

"Before the trip my aunt made to Florida, to which I testified that I saw her on the trip, I heard a conversation between my aunt, Mrs. Runnells, deceased, and my mother, Julia

Keairnes, with reference to my going with her to Florida. I did not take part in that conversation. My aunt, Mrs. Runnells, was talking to my mother. * * *

"The witness: My mother was sick, at the time, and Mrs. Runnells said to her that, if she would let me go to Florida with her, and take care of her on these trips, that she would give me the farm, for what I had done for her, going on these other trips, and going to Florida with her. * * *

"Mr. Kellogg: What did your mother say, if anything, if you know? A. She told her she was sick, but she would give her consent for me to go; she would try to get along to home the best way she could.

"Mr. Kellogg: What, if anything, during that conversation with your mother, did Mrs. Runnells say as to what she would promise you if you would do that? A. She told her that she would promise me the farm and a whole lot more, for what I had done for her, and for taking care of her and going with her on this trip. * * *

"The witness: When she was through with it, the farm was mine.

"Mr. Kellogg: Did you take any part in the conversation you have just detailed,—the conversation between your mother and her sister, Mrs. Runnells? A. No.

"Mr. Kellogg: Was any of that conversation addressed to you by Mrs. Runnells, that you have testified to?

"The witness: She told it to my mother."

On the same subject, Julia Keairnes, the mother of the plaintiff, testified as follows:

"I remember them going to Florida, all right. I had a talk with my sister, Mrs. Runnells, about Edith, going with her to Florida. Mrs. Runnells came up to my house and wanted me to let Edith go with her to California, and I told her—Mrs. Runnells—that I didn't see how I could let her go, because I wasn't well enough,—I was sick at that time; and then Mrs. Runnells said to me, she says, 'If you will let Edith go to California with me, and for what she has done for me, I will give her the farm.' And then, when Mrs. Runnells got ready to go home, she said to me, she says, 'The farm is Edith's now, when I am through with it,'—when she was through with it. Mrs Runnells never said nothing to me about providing, or anything

of that kind, when she went on the Florida trip. Why she told me that she had made her will, and had willed the farm to Edith. * * *

"Q. What, if anything, did your sister, Mrs. Runnells, say to you at any time about what Edith had done for her, that she was giving her this land when she died? A. Well, she said that she was going to give it to Edith, because Edith had always took good care of her, and was always ready to take care of her when she was sick, and always give her good care. Q. What, if anything, did she say that she had told Edith? A. Why, she said that she had told Edith that she was going to give her the farm, for what she had done for her. Q. How many times did your sister tell you that? A. Well, she told me that several times. I can't just say how many times, but she told me that several times. * * * I think, about four years before she [Mrs. Runnells] passed away, that she was talking to me about it, and she said she was going to give the farm to Edith. * * * A. Yes, that she was going to give the farm to Edith. She was going to give Edith the farm, if I would let her go with her,—if I would let Edith go to Florida with her; that she would give her the farm, for what she had done for her, and for going to Florida with her. * * * A. Why, she said—I just told you that she said, 'Now the farm is Edith's, when I am through with it.' Wasn't that giving it to her? Q. Well, she said she was going to give it to her? A. She didn't say she was going to. She said, 'Now, the farm is Edith's when I am through with it.' * * * "

The foregoing is all the evidence which is directed to the actual making of the alleged contract. Other witnesses testified to purported admissions. Ethel Chamberlain testified:

"I remember the circumstances of her making a trip to Florida. That was in January, 1919. I was talking with her, before she made that trip. This talk was in front of the post office, three days before they left. No one was present but she and myself.

"Mr. Kellogg: I am asking what she said.

"The witness: And I asked her who were going with her, and she said, 'Edith Keairnes,'—at that time it was; and I made the remark she was awful nice to her, taking her on a long trip like that; and she said she had the money,—the money was

hers; and she said, when she felt like going, she would go on her own accord; and she said that Edith had been so terribly good to her, in helping her, and a companion, that she had promised her a farm; and I understood her to say at that time, some property located there in Dunlap. She said Edith—anyway, she worded it—she said Edith would be her sole heir, in case of her death, at that time. * * * A. Yes, she mentioned at that time that her sister—that was Mrs. Julia Keairnes—was poorly in health, but they had arranged so that Edith was going to go, with the understanding of getting the farm when she was through with it. She said that Edith had been terribly good to her. * * * She talked to me one evening on the porch about what she was going to do for Edith. The talk was about the same subject. Edith at that time was present. She heard that conversation. Well, she said when she was dead and gone, that Edith would be her sole heir to her farm, in Shelby County.

"Mr. Kellogg: What, if anything, did she say as to why she was going to make her her sole heir?

"The witness: Because Edith was so good to her, in staying with her. * * * Mrs. Runnells volunteered that talk on the sidewalk. She said, 'Edith and I are going to make a trip to Florida.' She mentioned Edith in the talk. Q. She said, 'I have always taken her, and I am going to take her to Florida. I have plenty of money; I am going to show Edith a good time in Florida,'—is that what she said? A. That is just exactly what she made the remark. She didn't say anything about expenses. She said it was her money; she says, 'I have plenty of money;' and she says, 'I will use it the way I please.' She said that. Those were her exact words. Why, she just made the remark she was going to go on her own money, and said she had earned it, and she would do with it the way she pleased; it was hers. She worded it like she and Edith both were going to have a good time. She says, 'We are going to see some of the country, and have a good time.' That was, she and Edith. Q. You said, 'I wish it was me going with you on that trip, instead of Edith?' A. Yes, sir. Then she made the remark how good Edith had been to her, and always had taken care of her, and stayed with her through her sicknesses and her troubles; and she seemed to think a good deal of her; and she made the remark, and said, when she died, she only had one farm, and Edith would get

that. Q. She said, in substance, she was going to will Edith the farm? .A. Why, she said, when she died, she had promised Edith a farm in Shelby County. * * * And she also made the remark, she was going to make her her sole heir. * * * A. She says, 'When I die,' she says, 'Edith gets everything I got,' she says, 'because she stayed with me, and she has done for me when the rest has not.' * * * She said she was giving Edith this farm because Edith had been good and faithful in taking care of her. She never said she had told Edith that. Edith was staying there, and heard her, one evening, what she said. * * * She says, 'I have promised it to her, a farm in Shelby County;' and then that was the second time she said that. The first time I was talking to her, when they was making arrangements for Florida, she says that Edith had always been good to her; she would be her sole heir, if she ever died.''

Delia Forrest testified:

''Edith's mother was in the house at the time of this talk; she wasn't in the room where we were; she was sick in bed; and Edith's grandfather was in and out of the house. When I went to Edith's house that day, her aunt, Sarah Runnells, was in there, and they were talking about a trip to Florida; and I really didn't pay a whole lot of attention to it; only I heard them talking about going to Florida; and when she got ready to leave, she said, 'Edith, you had better make up your mind to take the trip to Florida with me;' and she said, 'I leave you a farm, when I am dead, and for the other things you have done for me.' Q. What did Edith say? A. She said she would have to consider; that her mother was sick, and have Julia able to have her leave; that she would have to think about it. * * * A. She says, 'When I am gone, I will leave you a farm.' ''

Emma Van Slyke testified:

''Well, she said that Edith was so good to her that she intended to leave her property to her. She has told me that a number of times. She said that the other members of her family never came near, at different times. * * * Q. Well, what was her language? A. She said, 'Because Edith has been so good to me.' Q. Yes? A. 'That I intended to leave my property to her.' Q. Those were her exact words? A. Those were her exact words. Q. Now, she said she intended 'to leave my

property to her?' A. Yes, sir. Q. Those are her exact words?
A. I think they are exact."

The foregoing is sufficiently illustrative of all the corroborative evidence bearing on the existence of the contract.

III. With the foregoing evidence before us, we have to consider its sufficiency as a matter of law. Since the case does not rest upon a *quantum meruit*, the burden was upon the claimant to establish, not only the fact that a contract of some kind was entered into, but also the terms of such contract. For that purpose, we have to look to the testimony of the claimant and her mother, and to such alone. The evidence of the other witnesses as to statements made by the decedent are purely corroborative, and of themselves tend to prove nothing more than a purpose or promise on the part of the deceased to make a gift or devise, and would come within the prohibition of the statute of frauds. To make such evidence admissible at all, it was essential that she should prove the terms of a contract which had been partly performed by the claimant. The first inquiry, therefore, is, Did the conversation between the decedent and Julia Keairnes, claimant's mother, constitute an express contract which was mutually binding upon the decedent and upon the claimant herein? To get the real legal bearing of this conversation, as testified to by the claimant, let us suppose that it had occurred in the absence of the claimant, and that it had been testified to by some third person, who heard it. Could it then be claimed that such conversation amounted to a valid contract between the decedent and the claimant? Obviously not. Is the claimant, therefore, entitled to say that the conversation became effective as a contract between her and the decedent *because she was present and heard it*? To so contend is to say that the conversation, because of her presence, became a *personal transaction* between her and the decedent. She was permitted to testify on the theory that the conversation was neither a personal transaction nor a personal communication with her. If a personal transaction, then her testimony was not admissible at all. If her testimony, therefore, is to stand at all, it must be on the theory that she was an impersonal listener to the conversation, and that it did not create a transaction personal to her. The very ground, therefore, upon which she offered her testimony, completely negatives the personal in-

terest which she argumentatively claims to have acquired thereby. It was pleaded that the contract was made, not only by herself, but also by her mother, in her behalf. If made by her mother, in her behalf, in her presence, then it would still be a personal transaction, to which she could not testify. But we know no ground upon which it can be said that the mother made the contract in the claimant's behalf. The claimant herself was present. She was under no disability. Her mother had no authority over her. She was *sui juris*. She was herself bound by nothing which her mother said or did. Nor did the mother purport to bind her or to make any promise in her behalf. Nor did the mother bind herself to any obligation or part with any consideration on her own part.

·. The only evidence relied on to prove that the claimant entered into the contract is the fact that she did go to Florida with the decedent, and this brings us to the statute of frauds.

If the claim had been predicated upon a *quantum meruit*, and duly proved, an implied contract for reasonable compensation might have been relied on. But substantially all the evidence introduced herein is barred by the statute of frauds, unless it be made to appear that the actual contract entered into was subsequently performed by the claimant, in whole or in part. No legal implication will lift this bar. The burden was on the claimant to show, not simply that she went to Florida, but that she bound herself by contract to go to Florida, and that her going was referable to her contract. We have frequently held that, where part performance is relied on to avoid the statute of frauds, it must be shown that the performance is referable solely to the alleged contract. *Runnels v. Anderson*, 186 Iowa 1370; *Peck v. Foggy*, 199 Iowa 922; *Walkley v. Clarke*, 107 Iowa 451. The claimant pleaded that the consideration for the decedent's promise included her past services, such as the previous trips to California and Denver. Such is the theory of her argument. But the alleged past services cannot avail to take the case out of the statute of frauds, nor to render admissible the evidence of the alleged promises of the decedent. Only performance subsequent to the alleged promise is available to that end. The question of subsequent part performance is, therefore, vital to the

2. FRAUDS. STATUTE OF: operation of statute: part performance: essentials of consideration.

claimant's case. If she fails at this point, substantially all her evidence is rendered inadmissible, under the statute of frauds. Her former trips were not referable to the contract, nor were any former services rendered by her referable thereto. If it is to be said that the Florida trip was referable thereto, it must be because the circumstances put in evidence permit no other rational hypothesis. The proof, if any, is purely circumstantial. One significant deficiency at this point is that the alleged part performance lacked substance. It was formal, rather than substantial. It was colorable, rather than real. It carried no benefit to the decedent, other than the mutual pleasure of both. To reduce such an arrangement into a formal bargain, enforcible at law, would of itself tend to destroy the anticipated pleasure to result therefrom. Substantial consideration has always been deemed a ground of favorable inference in this class of cases. *Garman v. Wettengel*, 199 Iowa 1150; *Spicer v. Administrator of Est. of Spicer*, 201 Iowa 99; *Peck v. Foggy*, 199 Iowa 922. The claimant's contention at this point puts the decedent in the attitude of saying to her:

"I offer you a favor. I will give you a trip to Florida as my companion, at my expense. If you will accept it, I will give you my farm."

The claimed promise was essentially the promise of a gift, and was wholly unperformed. If the claimant, as a donee, had received possession of the land, without a conveyance thereof, and had builded valuable improvements thereon, and if she were now seeking the consummation of her gift by a proper conveyance, a very different question would be presented.

After a very careful consideration of the entire evidence herein, we are firmly convinced that the circumstances proven thereby are not sufficient to warrant the finding of the jury. Not only are these circumstances not inconsistent with any other rational hypothesis, but they *are* inconsistent with the finding of the jury. They are consistent with the theory that the decedent did have, at the times in question, a purpose to devise her farm to the claimant, voluntarily and gratuitously, and not otherwise. This is the clear purport of all the testimony of the witnesses for the claimant. To permit a jury to say, upon this evidence, that the decedent intentionally bound herself to an enforcible contract to give her farm to the claimant, under the

circumstances disclosed, is to disregard wholly the application of Sections 11257 and 11286, Code of 1924, to the case, and is to disregard likewise the rule governing the consideration of circumstantial evidence.   The enactment of these statutes was wisely intended to protect the estates of decedents against predatory claims.   The claimant herein is in the position of claiming a valuable farm under an oral contract, and seeks to avoid the statute of frauds by an alleged performance of a consideration essentially nominal.   The defendant's motion for a directed verdict should have been sustained.

The judgment below is, accordingly,—*Reversed.*

DE GRAFF, ALBERT, and MORLING, JJ., concur.