GOLDA A. VANSTON, appellee, v. DAN RUPE, appellant.

No. 48204.

(Reported in 57 N.W.2d 546)

MARCH 10, 1953.

Max R. Werling, of Tipton, and Edward L. O'Connor, of Iowa City, for appellant.

Edward J. Dahms and Fisher & Fisher, all of Cedar Rapids, for appellee.

GARFIELD, J.—Plaintiff's petition, filed August 9, 1951, alleges she worked for defendant on his farm from about December 1, 1940, to March 1, 1945; about December 1, 1947, plaintiff agreed to nurse, care and keep house for defendant who was to supply living quarters and plaintiff was to pay him $25 a month; in order to pay plaintiff for her services and further pay her for services previously rendered, at the end of two years defendant was to buy or build a new home for the parties to live in and defendant agreed that at the end of four years he would deed plaintiff said home for her services; plaintiff carried out her part of the agreement; defendant purchased a home in Tipton in August 1950, in which the parties lived until about July 12,

1951, when defendant repudiated his agreement and notified plaintiff to give up possession of the home; on December 1, 1951, plaintiff will be entitled to a conveyance of said real estate and she asks that defendant be required to deed it to her.

Defendant's answer admits: plaintiff worked for him on his farm for a considerable time but says she was fully paid, he purchased the home in Tipton in August 1950, he notified plaintiff about July 12, 1951, to surrender possession thereof. Other allegations of the petition are denied. Defendant states he rented the Tipton home to plaintiff for $25 a month which she has not paid. Defendant's cross-petition in four counts claims: $375 for rent of the home, $597 due on an agreement for the joint purchase and upkeep of an automobile, $50 for nursing plaintiff, $200 for depriving defendant of possession of the home since about July 12, 1951.

On August 15, 1951, defendant Rupe as plaintiff filed his petition in forcible entry and detainer against plaintiff Mrs. Vanston as defendant to recover possession of the Tipton home. By agreement this action was consolidated for trial with plaintiff Mrs. Vanston's suit for specific performance.

Trial as in equity was had in November 1951, and on January 4, 1952, defendant Rupe was ordered before January 18 to deed the Tipton property to plaintiff Mrs. Vanston upon her paying him $390. Of this sum $125 was for rent, $50 for nursing, $200 for depriving defendant of part possession of the home from August to December, $15 for loss of storage. Nothing was allowed defendant on his cross-petition because of the agreement as to the automobile. Defendant Rupe has appealed. Our review is de novo. Rule 334, Rules of Civil Procedure.

Witnesses for plaintiff were plaintiff herself, Mr. Hullinger who acted as plaintiff's attorney until just before the trial commenced, Mr. Bennett, husband of plaintiff's sister, and Mr. Waldemer, a neighbor who testifies plaintiff did a lot of work on defendant's farm, both in the house and outside, for about four years. Main witnesses for defendant were defendant himself and three ladies who were well acquainted with the parties.

Plaintiff was forty-seven at the time of trial. For three years just before the trial she was a demonstrator of Stanley Products

—wearing apparel, cosmetics, household and other articles. Before that she taught school five years. The last year she taught she was also a Stanley demonstrator. Plaintiff has been married three times. Each of her first two marriages ended in divorce procured by her. Defendant, nearly seventy at the time of trial, was a widower who farmed until 1946. He quit school in the third grade and reads and writes with difficulty.

Plaintiff and defendant met about December 1, 1940, when plaintiff responded to defendant's "ad in the paper" for a housekeeper on the rented farm he and three sons occupied near Tipton. Defendant employed plaintiff to do the housework and agreed to pay her $5 a week and furnish board and room to her and her son, then about eight. March 1, 1941, they all moved to a farm defendant had purchased in Linn County. However, the three sons were inducted into the Army or Navy before the corn was planted. Defendant begged plaintiff to stay on the farm. Plaintiff testifies he said if she would stay and help him he would make it right with her.

After defendant's sons left, plaintiff worked outside the house as well as inside. She milked cows, helped with the calves and pigs, helped clean out the barn, raised chickens and a garden and kept the business records for the farm. In the fall of 1943 plaintiff picked corn. She says that on several occasions between the spring of 1941 and the fall of 1943 "he mentioned the matter of compensation due to what I had done outside and * * * in keeping the business part of the farm going that he really owed me right around $2000 when he was financially able to do it. I said that is OK, I am in no hurry."

In December 1943 a son of defendant's was released from the Army and returned to the farm. After that plaintiff did not do much outside work but continued to keep house until the spring of 1944—"During that period he gave me $9 per week spending money for doing the inside work." Before that she received $5 a week and board and room for herself and boy.

About May 1, 1944, plaintiff left the farm and went to live in Marion. Plaintiff testifies defendant ordered her to leave because of a "spat" he had with her boy, then eleven or twelve. Defendant says plaintiff left the farm because he refused her

request to will her a share of his farm. After plaintiff left the farm another woman kept house for defendant until the fall of 1945. He paid her $7 a week and she also kept her son with her at the farm.

In the fall of 1944 plaintiff moved to Cedar Rapids from Marion. For nearly a year after she left the farm defendant saw her many times both in Marion and Cedar Rapids. He asked her to return to work for him but she refused. She says, however, she went to the farm some evenings, week ends and holidays and helped what she could. Plaintiff denies she ever saw a housekeeper at the farm on these occasions although defendant and the housekeeper both testify she was then working there. After plaintiff went to Marion she received usually $35 to $40 a week in other employment.

March 31, 1945, plaintiff married her second husband. She divorced him about December 1, 1947. Plaintiff and defendant did not see each other during this period. Defendant quit farming in 1946 and stayed with a married daughter near Tipton and a brother in Indiana. In November 1947 defendant wrote plaintiff from Indiana and just before Christmas returned to Cedar Rapids when it is claimed the oral agreement was made on which plaintiff's suit is based.

Plaintiff says defendant told her she had been good to him and he wanted to stay with her: "I said, well, how about making some arrangement if I am going to take care of you? He said he thought the one that was nice to him was the one he should help and if I would let him make his home with me due to the fact I had worked on the farm like I did and really not have gotten anything out of it, that if I would let him stay with me four years he would either buy or build a home for me which would be mine at the end of four years."

From Christmas 1947 defendant stayed with plaintiff in her apartment in Cedar Rapids until the fall of 1948 when they moved to an apartment in Tipton. After six months they moved to another apartment in Tipton where they stayed about a year and a half until September 1, 1950, when they moved into the house in Tipton defendant purchased in August for $5300. This is the property the trial court awarded plaintiff. They left both

apartments in Tipton because the landlady objected to defendant's cough. According to plaintiff she paid the household expenses and defendant paid her nothing since the claimed oral agreement was made. Defendant testifies, however, he agreed to and did pay plaintiff $10 a week for his board and room throughout this period.

Until the spring of 1950 plaintiff taught school. After that she continued to demonstrate Stanley products. In 1949 she taught school and also was a Stanley demonstrator. A door was cut in the house in controversy and steps and a sidewalk were built to facilitate handling Stanley products.

When defendant bought the house plaintiff agreed to pay him $25 a month for at least a year. Plaintiff says defendant asked her to make these payments because the house cost a little more "than what it all amounted to for my work on the farm and the four years of care." Plaintiff paid $25 a month for eleven months after the house was purchased and defendant signed eleven receipts each for $25. The receipts were written by plaintiff, except for the signatures, and were marked "for rent." Plaintiff also paid $19.40 for some drapes, curtains and blinds for the home. She bought a deep freeze and owns the furniture except a table, stand and chair.

On July 12, 1951, after living in the Tipton house nearly ten and one-half months, defendant caused to be served on plaintiff a thirty-day notice of termination of tenancy at will and, on August 12, a three-day notice to quit the premises. As stated, plaintiff commenced this suit for specific performance August 9 and on August 27 she procured a temporary injunction against defendant's attempting to remove her from the premises. Plaintiff remained in possession and defendant has not stayed in the home since mid-July. Plaintiff kept the house locked during this period and defendant insists he could not get in. On October 4, 1951, plaintiff was married a third time.

There is a dispute as to the amount of cooking and housework defendant did during the more than three and one-half years since Christmas 1947. Plaintiff was gone much of the time during the day because of her teaching or demonstrating and defendant prepared many of his meals. He also raised a garden

and helped with the washing and other work, including delivery of Stanley products. Defendant's complaint against plaintiff's housekeeping is that she was gone too much. According to plaintiff, defendant "did a little cooking and puttered around the home when he wanted to."

Mr. Hullinger acted as plaintiff's attorney until just before trial commenced. For a year after their marriage plaintiff and her second husband lived in an apartment in Cedar Rapids owned by Mr. Hullinger. He testifies that in December 1944 plaintiff and defendant came to his law office and defendant wanted to trade his one-hundred-sixty-acre farm for Hullinger's apartment house, defendant said he wanted the apartment house for plaintiff, he owed her $2000 for work she had done on his farm. Such a trade was never consummated.

Mr. Hullinger also says he prepared a will for defendant about the spring of 1945 but it was never signed; in January 1948 plaintiff and defendant came to his office and defendant asked if he knew of a house for sale, defendant said he was buying the house for plaintiff, he had agreed that if she would let him stay with her and take care of him and she buy the groceries and furnish a place to live for four years he would buy a house and deed it to her at the end of that time, they looked at two houses Hullinger or his son had for sale but defendant thought one was not good enough and the other cost too much.

Mr. Hullinger represented plaintiff in a will contest involving property at Hamburg, Iowa, and in other matters. In February 1949 he, plaintiff and defendant were staying in a Hamburg hotel. Hullinger testifies defendant again asked if he knew of a house for sale and said he intended to buy one for plaintiff; Ernest Bennett was there at Hamburg "when I was talking to Mr. Rupe, and I purposely went into this agreement so Mr. Bennett would know about it. I said, Mr. Rupe, what was your agreement with Goldie [plaintiff]? He said 'my agreement was I was to live with her four years and she was to take care of me and at the end of four years I was to buy her a house satisfactory to both of us.'"

Mr. Hullinger also says defendant at Hamburg acknowledged he owed plaintiff $2000 from the time she worked on the

farm; in August 1950 plaintiff and defendant came to his office and said they were buying the house in Tipton to be plaintiff's "at the end of this four-year period"; later that fall defendant said the house had cost more than he assumed it would and "he felt Golda [plaintiff] should pay $25 a month for taxes, upkeep and so on"; Golda said she had agreed to that. Hullinger testifies he told plaintiff and defendant many times they should have a written agreement but they said they did not need one and would do what they said they would.

Mr. Bennett, plaintiff's brother-in-law, says he heard defendant tell Mr. Hullinger at Hamburg he had to get a place for Golda to make her home, if she made a home for him four years she was to get a home of some kind; defendant "figured she had around $2000 coming to her for work she did other than keeping him at the present time"; one time in Tipton defendant said when he leased his farm he reserved one acre to build a house on for Golda that she was to have after four years.

For defendant, a Mrs. Maurer testifies she has known plaintiff thirty-five years; in July 1951 plaintiff and defendant stopped at her farm home when plaintiff was starting for Missouri by automobile, defendant told plaintiff he wanted her out of the house by August 1; later plaintiff told the witness she returned to the Tipton home after starting for Missouri and got her records so defendant "now had nothing to show he paid anything" and she had receipts showing she paid him $25 each month; "she told me she paid $25 and he paid her $10 a week * * *. Mrs. Vanston told me once she bought the house and intended to pay for it like she paid for her car and if they could pay it off in time it would be hers * * *. Golda often talked to me about her problems. She never told me she had some interest in this house." This witness also testifies plaintiff told her in July 1951 defendant could not get in the house unless she was there to let him in. On cross-examination Mrs. Maurer says plaintiff told her defendant paid her $10 a week and she paid him $25 a month, which left him $15 a month to pay.

Defendant had signed a letter of credit for plaintiff with the Stanley Company which he canceled about July 1951. Mrs. Bowman, a farmer's wife who also demonstrates Stanley prod-

ucts, testifies she had been in the Tipton home several times a week, the day plaintiff learned defendant had canceled the letter of credit plaintiff asked her and Mrs. Swick if they would do her a personal favor and say they had heard Rupe say he bought that house for her, "probably something would come up" as she "wasn't going to stand" for taking up the letter of credit. The witness says she never heard defendant say he bought the house for plaintiff.

Mrs. Swick, a trucker's wife, visited plaintiff frequently. She testifies she heard plaintiff tell defendant in July 1951 he could not get in the house "until it is settled by law"; before this suit was started plaintiff told her she paid $25 a month rent and he paid board; plaintiff told her several times she thought defendant should make provision the house should be hers when he was through with it. This witness gives about the same testimony as Mrs. Bowman concerning the "personal favor" plaintiff asked of them and also says she never heard defendant say he bought the house for plaintiff. On cross-examination Mrs. Swick admits she told plaintiff's attorney the day before trial started she knew nothing about this matter.

As a witness defendant denies: he agreed to buy a house for plaintiff, he told Hullinger or Bennett he would buy her a house if she would care for him four years, he told Mr. Hullinger or anyone else he owed plaintiff $2000 for extra work she did on the farm. Defendant says when he hired plaintiff to work on the farm "she said she would work inside and outside, like the rest of the girls were"; while defendant lived in plaintiff's apartment and in the Tipton home he trusted her to do the bookkeeping and he signed the receipts she asked him to sign; when he returned to the home from Mrs. Maurer's in July 1951 his receipts and the calendar which showed his weekly payments to plaintiff were gone; he did not ask Mr. Hullinger to draw his will; Hullinger suggested to defendant once he had not paid plaintiff enough for her work on the farm and he should pay her some more. Other testimony of defendant has been mentioned heretofore.

In 1948 plaintiff and defendant bought a used car for $1150 on which plaintiff turned in her old car at $50. Each

one was to pay half the cost and upkeep. In January 1951 defendant sold plaintiff his interest in the car for $100. Defendant first testified plaintiff paid only about $60 or $75 for expenses on the car. However, plaintiff produced receipts or checks for her share of the cost and upkeep of the automobile. Defendant says the car was driven mostly on plaintiff's business. We understand defendant did not drive it himself.

In rebuttal plaintiff denies she asked Mrs. Bowman and Mrs. Swick to testify defendant said he would give her this home. She says she merely asked them to testify to anything they knew. Plaintiff also testifies she is willing to let defendant come in the house any time he wants to until December 1, 1951.

For present purposes the above is a sufficient summary of the evidence which fills 175 pages of the record.

I. The agreement plaintiff pleaded and testified to is that defendant was to buy or build a home he would deed plaintiff at the end of four years. The property is not otherwise identified. Defendant does not argue the claimed agreement is too indefinite to warrant specific performance. His counsel may feel purchase of the Tipton home made the claimed contract definite in this respect under such decisions as Daily v. Minnick, 117 Iowa 563, 91 N.W. 913, 60 L. R. A. 840; Crawford v. Carter, 72 S. D. 514, 37 N.W.2d 241, 243, and citations; Id., S. D., 52 N.W.2d 302, 304. See also Lanfier v. Lanfier, 227 Iowa 258, 264, 265, 288 N.W. 104; 58 C. J., Specific Performance, section 100, page 935. In any event the arguments seem to assume the Tipton home is the subject matter of the alleged agreement and we consider the case in the light of that assumption.

II. While the thought has been expressed in language that varies somewhat, it is well settled that specific performance of an oral contract to convey realty will not be decreed unless proof of the contract is clear, satisfactory and convincing. The various expressions of this thought found in our decisions are set out in Williams v. Harrison, 228 Iowa 715, 723, 293 N.W. 41, and citations. This does not mean that proof of the contract must be undisputed or to an absolute certainty—reasonable certainty is sufficient. Williams v. Chapman, 242 Iowa 294, 307–309, 46 N.W.2d 56, 63, 64, and citations.

Requirement of this high degree of proof is not confined to cases where the alleged vendor is dead although there is added reason for the rule, and it is sometimes applied with greater strictness, in such cases. Clear, satisfactory and convincing proof has been required in these and perhaps other cases where the contracting parties were still living: Williams v. Chapman, supra; Peddicord v. Peddicord, 242 Iowa 555, 560, 47 N.W.2d 264, 267; Witte v. Gardner, 162 Iowa 117, 123, 143 N.W. 835; Wills v. Westendorf, 140 Iowa 293, 296, 118 N.W. 376; Stem v. Nysonger, 69 Iowa 512, 514, 29 N.W. 433. See also Bombei v. Schafer, 242 Iowa 619, 625, 47 N.W.2d 842, 845; Crawford v. Carter, supra, S. D., 52 N.W.2d 302, 304; 58 C. J., Specific Performance, section 555, page 1198; 49 Am. Jur., Specific Performance, section 21, page 32, section 169, page 191; annotation 101 A. L. R. 923, 998.

What we have just said does not conflict with our statement in Carlson v. Bankers Trust Co., 242 Iowa 1207, 1214, 50 N.W.2d 1, 6, where it was contended proof of a claim in probate, tried as an ordinary law action, must be clear, satisfactory and convincing. We cited a number of decisions that such claims may be proven by a preponderance of evidence and observed that a higher degree of proof is required in actions in equity to enforce a decedent's oral contract to dispose of property. The Carlson case considered the requisite degree of proof only in actions against estates of decedents and there was no occasion to consider the rule applicable where the parties to an alleged oral contract to convey realty still survive.

III. Defendant has relied throughout on the statute of frauds, subsection 3 of section 622.32, Code, 1950. This provision does "not apply where the purchase money, or any portion thereof, has been received by the vendor, or when the vendee, with the actual or implied consent of the vendor, has taken and held possession of the premises under and by virtue of the contract, or when there is any other circumstance which, by the law heretofore in force, would have taken the case out of the statute of frauds." Section 622.33.

We have frequently held the term "purchase money" includes the performance of services in the future under a promise

so to do when the services are thereafter performed. Williams v. Chapman, supra, 242 Iowa 294, 311, 46 N.W.2d 56, 65; Fairall v. Arnold, 226 Iowa 977, 997, 285 N.W. 664; Hurst v. Jenkins, 161 Iowa 414, 418, 143 N.W. 401, and citations; Daily v. Minnick, supra, 117 Iowa 563, 570, 91 N.W. 913, 60 L. R. A. 840. See also annotation 101 A. L. R. 923, 1097.

In such a case as this proof of what the vendee did that amounts to consideration for the claimed oral contract to convey must be as plain and definite as proof of the contract itself and it must be referable exclusively to such contract. Fairall v. Arnold, supra, 226 Iowa 977, 987, 988, 285 N.W. 664, and citations; Collins v. Collins, 138 Iowa 470, 472, 114 N.W. 1069. See also Williams v. Chapman, supra, 242 Iowa 294, 312, 46 N.W.2d 56, 66; 58 C. J., Specific Performance, section 561.

IV. We are unable to find clear, satisfactory and convincing proof of the alleged contract. Plaintiff alone testifies to it directly. Testimony of Mr. Hullinger and Mr. Bennett as to claimed admissions or declarations of defendant is circumstantial and inferential only. In re Estate of Runnells, 203 Iowa 144, 146, 212 N.W. 327; Fairall v. Arnold, supra, 226 Iowa 977, 991, 285 N.W. 664. The unsatisfactory character of such evidence and the caution with which it should usually be received have been frequently pointed out. Kuhn v. Kjose, 216 Iowa 36, 39, 248 N.W. 230, and citations; Wills v. Westendorf, supra, 140 Iowa 293, 295, 296, 118 N.W. 376, and citation; 20 Am. Jur., Evidence, section 1196, page 1048.

Our views here are succinctly stated in an earlier case of this kind, Wilmer v. Farris (Cole, J.), 40 Iowa 309, 310: "The plaintiff has failed to prove, satisfactorily, the alleged contract and its definite terms. The plaintiff alone testifies to the contract, while the defendant with equal positiveness denies it under oath as a witness; and the only corroboration of plaintiff consists of admissions by defendant in conversations with third persons— a kind of evidence the law recognizes as weak and unsatisfactory * * * ."

No disinterested witness testifies for plaintiff except Mr. Waldemer who tells of the work plaintiff did on the farm more than two and one-half years before the claimed contract was

made. It is obvious such work is not referable to the contract and this testimony cannot avoid the statute of frauds. Only performance by plaintiff subsequent to the alleged agreement is available to that end. See authorities last above.

There is definite indication of a plan to assert a claim against defendant as early as February 1949, when plaintiff's attorney questioned defendant in the presence of plaintiff's brother-in-law so he could act as a witness. Mr. Bennett, however, had difficulty in recalling the conversation. Incidentally Mr. Hullinger and Mr. Bennett do not agree as to the place of the conversation. The former testifies it was in the hotel lobby, the latter says it was in his room which he did not leave very much because of a broken leg.

▆▆ Applicable here is this from 31 C. J. S., Evidence, section 268, pages 1019, 1020: "The following circumstances have been noticed as tending to impair the credibility of testimony to oral declarations: * * * that the alleged statement was obtained for the purpose of being used against declarant in the suit; that witnesses testifying to the statement are parties interested * * *; * * * that the witness testifies to several different conversations which together supply all that is necessary for the case in hand."

In the main defendant denies the testimony of plaintiff, Mr. Hullinger and Mr. Bennett. The three women who testify for defendant cast doubt on the truth of plaintiff's claim. While their evidence is largely of alleged oral statements by plaintiff and is of the same general character as the testimony of Hullinger and Bennett, the statements attributed to plaintiff are much more recent than those said to have been made by defendant and, so far as shown, the three women are disinterested witnesses.

Mrs. Bowman and Mrs. Swick furnish indirect corroboration for defendant's testimony that he paid plaintiff $10 a week for his board and room although Mrs. Swick does not mention any amount. It is true defendant produced no receipts for such payments but he says most of them were made in cash and that plaintiff took the calendar on which the payments were marked. Although plaintiff was called in rebuttal, we find no denial of testimony for defendant that plaintiff took this calendar.

As we have indicated, the burden was upon plaintiff to show by clear and definite proof she kept house for defendant under the oral contract claimed by her. Obviously board and room furnished by her under a promise by defendant to pay $10 a week therefor or under a mere hope that defendant would ultimately give her the home would not be exclusively referable to the alleged oral contract to convey.

Without further discussion of the evidence we hold it does not warrant specific performance.

Defendant is entitled to recover from plaintiff on his cross-petition total rents of $125 from August to December 1951, inclusive. We feel recovery on the cross-petition should be limited to such amount. What nursing defendant furnished plaintiff was done under circumstances that indicate it was furnished gratuitously. We find no evidence of the extent of defendant's damage, other than his claim for rent, in being deprived of possession of the house.

It follows from our decision in plaintiff's suit for specific performance that defendant is entitled in his action for forcible entry or detention to judgment under Code section 648.22 putting him in possession of the premises in question. Plaintiff however shall be permitted to remove her furniture and belongings, including the drapes, curtains and blinds paid for by her.

Two thirds the costs in the trial court are to be taxed to plaintiff, one third to defendant. Costs in this court to be taxed to plaintiff.

For decree pursuant to this opinion the cause is—Reversed and remanded.

All JUSTICES concur except LARSON, J., who takes no part.