Leonard A. PETERSON, Appellee,

v.

Ross K. PETERSEN and Viola Stevens, Individually and as executrix of the estate of Clifford E. Stevens, deceased, Appellant.

No. 69451.

Supreme Court of Iowa.

Aug. 22, 1984.

Dennis G. Larson, Decorah, for appellant.

R.J. Sokol, Maquoketa, and Charles W. Faulkner, Minneapolis, Minn., for appellee.

Considered by HARRIS, P.J., and McCORMICK, McGIVERIN, LARSON, and CARTER, JJ.

LARSON, Justice.

This action seeks partition of the proceeds of sale of a twenty-three acre tract of land in Decorah, Iowa, which had been

planned for development as a shopping center. The plaintiff, Leonard Peterson, claimed that the defendant Ross Petersen (no relation), had orally agreed to convey a one-third interest in the land in exchange for Leonard's services in the development of the project. Proceeding in equity, the district court found that although the alleged agreement to convey an interest in the land was oral, and thus subject to the statute of frauds, part performance by the plaintiff and promissory estoppel of the defendant made oral evidence of the contract admissible. It ordered a division of the sale proceeds from the land, which had been sold during the pendency of the case, and allowed the plaintiff his claimed one-third interest. The amounts due by Leonard to Ross on prior transactions, unrelated to the project at issue here, were deducted from Leonard's recovery. Ross appealed, claiming the evidence was insufficient to establish Leonard's interest in the land. We agree and accordingly reverse. Other claimed errors, involving procedural and evidentiary rulings, need not be addressed.

Iowa Code section 622.32, our statute of frauds, provides:

Except when otherwise specially provided, no evidence of the following enumerated contracts is competent, unless it be in writing and signed by the party charged or by his authorized agent:

. . . .

3. Those for the creation or transfer of any interest in lands, except leases for a term not exceeding one year.

Leonard's claim of a one-third interest in the land clearly falls within the reach of the statute of frauds. He concedes that. He relies, however, on two exceptions to the statute of frauds to make evidence of the oral agreement admissible.

He relies first on the statutory exceptions provided by Iowa Code section 622.33:

The provisions of subsection 3 of section 622.32 do not apply where the purchase money, or any portion thereof, has been received by the vendor, or when the vendee, with the actual or implied consent of the vendor, has taken and held possession of the premises under and by virtue of the contract, or when there is any other circumstance which, by the law heretofore in force, would have taken the case out of the statute of frauds.

The plaintiff also relies upon the doctrine of promissory estoppel to avoid the effect of the statute. See Restatement (Second) of Contracts § 139 (1981). See also Warder & Lee Elevator, Inc. v. Britten, 274 N.W.2d 339, 342 (Iowa 1979)(exception to statute of frauds under Uniform Commercial Code; prior Iowa cases regarding general statute of frauds discussed); Annot., Promissory Estoppel as Basis for Avoidance of Statute of Frauds, 56 A.L.R.3d 1037 (1974). The district court ruled for the plaintiff on both the part performance and promissory estoppel grounds.

I. *The Procedural Issues.*

After Leonard had rested his plaintiff's case and after a weekend recess, Ross appeared in the courtroom for the first time to present his defense. Leonard immediately moved to reopen the plaintiff's case, which the court allowed. He then called Ross as an adverse witness. At the close of this additional testimony, Leonard moved to amend his pleadings to include the promissory estoppel issue. This motion was also granted, over Ross's objection.

Granting leave to reopen the plaintiff's case and to allow the amendment are matters within the discretion of the trial court. See Iowa R.Civ.P. 88 (leave to amend to be "freely given when justice so requires"); Ackerman v. Lauver, 242 N.W.2d 342, 345 (Iowa 1976)(trial court has considerable discretion; amendments may be allowed any time before a case is finally decided); Iowa R.Civ.P. 192 ("At any time before final submission, the court may allow any party to offer further testimony to correct an evident oversight or mistake...."). See Anderson v. City of Council Bluffs, 195 N.W.2d 373, 378 (Iowa 1972)("trial court enjoys a wide discretion in reopening a case for the reception of additional evidence").

It was evident to the trial court, and is evident to us, that Ross intentionally avoided appearing in court until it was time for him to appear in his own defense. By remaining away from the fray until the plaintiff's case was completed, his theory apparently was that he could confine the scope of the action to one in rem and to avoid a personal judgment.

■ While such questionable trial tactics have the effect of causing piecemeal litigation and should not be condoned (there was litigation on the same subject matter then pending in Minnesota in which personal judgment was apparently sought), we need not dwell on that issue here. Suffice it to say that the trial court did not abuse its discretion in allowing the plaintiff to reopen his case or to amend his pleading to assert promissory estoppel.

As to the amendment, the alleged agreements between Ross and Leonard constituted the main thrust of the plaintiff's case. It is a small jump from there to the promissory estoppel theory, which also turned on Ross's oral agreements. Ross cannot seriously claim he was misled or prejudiced by the late amendment. Moreover, the reopening of the plaintiff's case to allow examination of Ross as an adverse witness was a justifiable response to Ross's late arrival on the scene and a foreseeable consequence of his own trial strategy.

## II. *The Substantive Issues.*

Partition is defined as

the division which is made between two or more persons of lands, tenements, or hereditaments, or of goods and chattels which belong to them as co-owners. The term is more technically applied to the division of real estate made between coparceners, tenants in common, or joint tenants....

59 Am.Jur.2d *Partition* § 1, at 772 (1971).

The parties correctly observe that in order for a partition action to lie, plaintiff must have a present interest in the land. *See Anderson v. Anderson,* 227 Iowa 25, 37, 286 N.W. 446, 452 (1939). Ross argues that Leonard has no such interest here, that his claim to the property is based solely upon an unenforceable oral agreement and, while this agreement might present grounds for some sort of contract action, it falls short of establishing an ownership right in the land itself. Moreover, he claims if there was such an agreement, it was conditional on Leonard's part and that the conditions were not met because he had failed to perform as agreed. On the other hand, Leonard contends Ross had given him an interest in the land through his oral agreement. His part performance and promissory estoppel, he claims, bar Ross from asserting the statute of frauds to defeat the claim.

While both parties thus focus primarily on the statute of frauds and the question of whether Leonard's performance, or Ross's estoppel, were sufficient to overcome its effect, our concern is more basic. That is whether any agreement for transfer of land, within or without the reach of the statute of frauds, was established by the evidence. In taking this approach, we assume, without deciding, that the evidence establishing the oral agreement was admissible.

An oral agreement to transfer an interest in land must be established by more than a mere preponderance of evidence. Because enforcement of such an agreement without convincing evidence would tend to frustrate the purpose of the statute of frauds, a greater quantum of proof is required.

The statute [of frauds] exists for the prevention of fraud and perjury; and the means that it adopts is to refuse enforcement unless the contract is evidenced by a signed document. When a plaintiff is asking enforcement without having such a document, there is always the possibility that he is attempting to effectuate the very kind of fraud that the statute was passed to frustrate. Therefore, before decreeing enforcement, in disregard of the statutory prohibition, the court must be thoroughly convinced that the oral contract was in fact made as alleged.

This explains the various protecting limitations of the part performance doctrine. One of these, and the most important and effective of all of them, is that specific enforcement will not be decreed unless the oral contract is proved to the entire satisfaction of the court.

2 A. Corbin, *Contracts* § 442, at 526 (4th printing 1972). *Accord Davis v. Davis,* 261 Iowa 992, 998–99, 156 N.W.2d 870, 874 (1968); *Snater v. Walters,* 250 Iowa 1189, 1192, 98 N.W.2d 302, 304 (1959); *Vrba v. Mason City Production Credit,* 248 Iowa 264, 268, 80 N.W.2d 495, 498 (1957); *Bell v. Pierschbacher,* 245 Iowa 436, 439, 62 N.W.2d 784, 786 (1954).

The quantum of proof required to establish an oral contract to convey an interest in real estate ranges from "the point of demonstration" and "most convincing" to "beyond a reasonable doubt." A. Corbin, *supra,* at 527.

■ We have held that, when a plaintiff seeks specific performance of an oral contract on land, the contract must be established by a preponderance of the clear, satisfactory and convincing evidence. *Knight v. Anderson,* 292 N.W.2d 411, 417 (Iowa 1980); *Severson v. Elberon Elevator, Inc.,* 250 N.W.2d 417, 420 (Iowa 1977); *Vanston v. Rupe,* 244 Iowa 609, 620, 57 N.W.2d 546, 551 (1953). We believe that standard should be applied here.

Our review is de novo. Iowa Code § 624.4. An examination of the record leads to the conclusion that there was not a preponderance of clear, satisfactory, and convincing evidence to support the plaintiff's claim to the real estate. While there was considerable evidence that Ross agreed to give an interest in the "project" or in the "net" from the parties' Decorah venture, there was little evidence that Ross agreed to convey an interest in the real estate itself.

The evidence showed that Leonard was a commercial real estate broker with considerable experience in the development of shopping centers. In 1967, an individual named Clifford Stevens (who was originally joined as a defendant in this action and who was one of the parties in the Decorah project) asked Leonard to go to Decorah to look at a shopping center site. He did so, and the two later went to a banker in Chicago who agreed that Decorah was a "sleeper" and had potential for such a shopping center.

Leonard testified that in the early 1970's Stevens came to him in "dire need of money." Leonard thought of Ross. Stevens and Ross got together. Ross loaned money to Stevens, who gave security to Ross in the form of farmland (not that involved in this case).

When Clifford Stevens' note came due to Ross, he was unable to pay. Ross, viewing a possible default by Clifford, went to Leonard noting that "Leonard got [him] into this loan" and requested his assistance in its collection. Leonard suggested that Ross become involved in the Decorah shopping center project by providing the financing and suggested that he, Leonard, would provide the experience.

According to Leonard's testimony, Ross agreed to put up the money if Leonard would do the "real estate work," including the leasing and rezoning, in exchange for a one-third interest in the real estate. At that time, title was still in another party, but Leonard testified that Clifford Stevens was "in control of it." Through Stevens, Ross obtained a transfer of the title from the owner to himself. (Neither Leonard nor Clifford Stevens were ever named in a document of conveyance. Leonard testified this was "only for convenience.")

The leasing project began. According to his testimony, Leonard sent out 100 to 150 letters to prospective tenants, concentrating on, "anchor lessees," or larger stores which would attract other businesses. These letters advised the potential lessees that "we" are developing a shopping center, indicating a possible ownership interest in Leonard. Some letters, however, also referred to the developers as his "clients." Leonard acknowledged that he "may have been wearing [his] broker hat" during at least some of the lease negotiations.

It soon became apparent that leasing would be difficult. The land, which was then agricultural, was not zoned for development as a shopping center. Leonard, who had previous experience with city councils, assisted in an attempt to have the area rezoned. The project met with substantial public resistance, and the city council initially refused to allow the rezoning. The matter was taken to district court, then appealed, by the developers. The district court ruling was reversed, and the area was ultimately rezoned.

Almost immediately upon the rezoning, the land was offered for sale by Ross. It is undisputed that at the time record title was held only in the name of Ross Petersen, and that he alone decided it would be sold.

Following Ross's decision to sell, Leonard sought out potential buyers. Again, it was not certain whether he was wearing his broker hat or his partner hat. He received three offers. Leonard instructed these prospective buyers to send their offers to Ross, who ultimately accepted one of them. Leonard testified that, in considering the offers, the main concern was how much "net" would result to Ross; the interests of Leonard and Clifford, if any, did not appear to be of any real concern. The option and offer documents which followed did not show any interest in either of them nor, apparently, were they even consulted for their approval.

Leonard's testimony was the only evidence specifically pointing to a contract to convey real estate. Another witness, Howard Tukey, testified that he had heard discussions by Leonard and Ross regarding the Decorah project and that Leonard was actively engaged in it. He testified that he had a conversation with Ross in which Ross said "the big Swede [Leonard] has really got to start earning his third." This witness, however, did not hear Ross say that Leonard would receive any interest in the real estate itself.

Similarly, two letters written by Ross were not specific. They showed that Leonard was to get a one-third interest in something, but they were indefinite as to the form that interest would take.

Ross's challenges to the court's admission of these letters must first be addressed. The first letter, from Ross to a Minnesota lawyer representing Ross and Clifford, was objected to as violating the attorney-client privilege, Iowa Code section 622.10. The second letter, from Ross to Clifford's widow, was objected to on the ground it discussed settlement between potentially adverse parties and thus was inadmissible on policy grounds. (A cross-petition by Clifford's widow against Ross was disposed of by settlement during the trial, but at the time this letter was offered in evidence, Ross and Mrs. Stevens were adverse parties.)

The letter to the attorney was admitted by the court, which concluded that "[t]his did not violate the attorney-client privilege ... because said attorney would have been representing two of the claimants at the same time." No explanation was given for the ruling admitting the letter to Mrs. Stevens.

While we might disagree about these rulings, we need not resolve these issues. In view of our disposition in the case, it would make no difference; even when the letters are considered, the plaintiff's evidence falls short of the required standard.

The letter from Ross to his attorney, dated August 11, 1973, outlined the agreement on the Decorah project:

1—I purchased the property from Bill [and] Mrs. Cornfourth and am the sole owner. There are no mortgages, leans [sic] or other obligations against it. As I understand it all real estate transactions in Iowa must be in writing.

2—The purchase price for Cliff's interest is $8,000 per acre plus one fourth (¼) of the net proceeds over and above the $8,000 per acre of either the appraised value of the center or the sale price of the land if for some reason I was unable to build, i.e.[,] lack of financing [,] renters etc. and sold the site for a shopping center to some one [sic] else.

3—Cliff is to be paid when the center is completed and appraised or when the land is sold. It is his wish to be paid in the form of interest in the center. Most likely in stock since I would have to form a corp.

Since I do not have the time or experience to set up a shopping center, I offered Len one third (⅓) of my net interest in the center if he would do the leasing and get permits. I told Len of my deal with Cliff so that he would know how much there could be in it for him.

While it is true the letter refers to one-third "net interest" for Leonard, it is not at all clear it was to be an interest in the land itself. It states that Ross was the "sole owner," that at least as to Clifford's share any division of interest would "most likely" be in the form of corporate stock, and mentioned "paying" Clifford. It is equivocal on the manner of how the division was to be made, and nowhere does it mention the prospect of a transfer of an interest in the land itself. Any specific terms of such proposed conveyance, such as would be found in even a barebones real estate contract, are completely lacking.

In Ross's letter to Mrs. Stevens, dated June 3, 1978, he stated: "I offered to give [Leonard] ⅓ of my interest if we got a shopping center. His job was to get the leases signed. I will still give him what I promised him, even though he did not actually get any leases signed."

Again, the form of the "interest" is not specific. In the same letter, he made it clear that Clifford's share was to be paid "[w]hen the property is sold as a shopping center site" which infers that Clifford's share would be paid in cash, not in stock as the earlier letter had indicated, and certainly not in land.

These letters point out the problem here: the parties were far too loose in their financial arrangement. Ross, apparently because of his financial leverage, was allowed to exercise almost complete control over the property and its disposition. There is nothing concrete showing whether the others' "interests" were to be in cash, stock, or land, when such conveyances would take place, or under what terms. It even appears Ross at one time considered not paying Leonard at all for his services.

■ The equivocal nature of the plaintiff's case, when coupled with Ross's contradictory evidence, compel a holding that the preponderance of clear, convincing, and satisfactory evidence test was not met. Ross, while admitting Leonard was to receive a one-third share, strenuously denied it was ever intended to be in the form of land. Legal title remained in Ross throughout the entire time involved here. He paid the real estate taxes, and he alone made the decision to sell. When that decision was made, the potential buyers were directed by Leonard to forward their offers to Ross, as owner.

Leonard's own actions had not always been consistent with those of an owner. At times he treated the real estate as if it were the property of a real estate client. And, when he filed a list of his assets in his 1975 Minnesota divorce action, he listed no interest in the land. He admitted that he had viewed his own relationship to the project in various ways, sometimes as a broker and sometimes as a partner. Seldom, if ever, though, did he evidence in his dealings with others that he was an owner.

We conclude it was error for the court to find an enforceable contract for conveyance of land. While there might be grounds for some sort of contract action, the evidence falls short of establishing an interest in the land itself. Hopefully these matters will be, or perhaps have already been, resolved in the Minnesota action pending at the time of trial. The trial court should have entered judgment for defendant Ross Petersen.

REVERSED.